REVISED JUNE 25, 1997

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-50144

_____

JOHN MICHAEL WHEELER, Independent
Executor of the Estate of Elmore
K. Melton, Jr.,

                                        Plaintiff-Appellant,

        versus

UNITED STATES OF AMERICA,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court for the
Western District of Texas
_____
June 19, 1997

Before GARWOOD, BARKSDALE and DENNIS, Circuit Judges.

GARWOOD, Circuit Judge:

    This case involves the determination of the federal estate tax

due from the estate of Elmore K. Melton, Jr. (Melton).  On July 13,

1984, Melton, then age sixty, sold to his two adopted sons, John

Wheeler and David Wheeler, the remainder interest in his ranch

located in Bexar County, Texas.  Melton retained a life estate in

the ranch and used the actuarial tables set forth in the Treasury

Regulations to determine the price to be paid by the Wheelers for

the remainder interest.  On May 25, 1991, Melton, then age sixty-seven, died.  Melton's federal estate tax return did not include any value for the ranch.  The Internal Revenue Service (IRS) issued a notice of deficiency, claiming that the sale of the remainder interest in the ranch to the Wheelers for its actuarial value did not constitute adequate and full consideration, and that accordingly the fair market value of the full fee simple interest in the ranch, less the consideration paid by the sons, should have been included in Melton's gross estate.  The court below agreed and, following a line of cases stating that the sale of a remainder interest for less than the value of the full fee simple interest in the property does not constitute adequate consideration for the purposes of section 2036(a) of the Internal Revenue Code, determined that Melton's estate had been properly assessed an additional $320,831 in federal estate tax.  We reverse.

**Facts and Proceedings Below**

I.

In the mid-1970s, Melton, who was born April 16, 1924, and never married, adopted two children, John Wheeler (John), who was born in 1956, and David Wheeler (David), who was born in 1958.  Following their graduation from college, both sons—John in 1979, David in 1981—were employed by The Melton Company, a corporation of which Melton was then sole shareholder, president, and chairman of the board.

From 1983 until his death in 1991, Melton engaged in a series of financial transactions with his sons that the government

2

contends had significant estate tax ramifications. On May 19, 1983, Melton gave John and David each 195 shares of The Melton Company common stock, representing approximately 16.2 percent of the 1204 shares outstanding. On June 30, 1984, The Melton Company, pursuant to a recapitalization plan, converted each share of existing common stock into one share of voting stock and three shares of nonvoting stock, denominated Class A and Class B shares respectively. On July 13, 1984, some three months after he turned 60, Melton gave John and David each 223 shares of Class B stock of The Melton Company.

Also on July 13, 1984, Melton executed a warranty deed conveying to John and David his 376-acre ranch, located in Bexar County, Texas. The deed reserved to Melton a life estate in the ranch.[1] For many years prior to the sale, and until the time of his death, Melton used the ranch as his personal residence. John and David paid for the remainder interest with a personal liability real estate lien note in the amount of $337,790.18, secured by a vendor's lien expressly retained in the deed and additionally by a deed of trust on the ranch. The deed and deed of trust were promptly recorded. The purchase price for the remainder interest in the ranch was determined by multiplying the sum of the appraised

---

[1] The deed conveyed to the Wheelers, "subject to the reservations hereinafter made," the fee simple interest in the described 376 acres, and then provided: "Except, however, that the grantor herein [Melton] reserves, and it is hereby expressly agreed that he shall have, for himself and his assigns, the full possession, benefit and use of the above-described premises, as well as all of the rents, issues and profits thereof, for and during his natural life."

3

fair market value of the ranch's fee simple interest, $1,314,200, plus $10,000, by 0.25509, the factor set forth in the appropriate actuarial table in the Treasury Regulations for valuing future interests in property where the measuring life was that of a person of Melton's age. *See* Treas. Reg. § 25.2512-5(A).

On February 12, 1985, the initial note, which bore interest at the rate of 7 percent and called for annual payments of at least $10,000 principal plus accrued interest, was revised to provide for monthly payments of $833.33 principal plus accrued interest, which remained at 7 percent.[2] On that date, John and David paid the amount due under the revised terms.

On October 18, 1985, Melton gave John and David each an additional 344 shares of Class B stock of The Melton Company.

In December 1986, Melton gave $10,000 each to John and David by forgiving that amount of each son's indebtedness under the note. On December 23, 1986, John and David received bonuses from The Melton Company of $50,000 and $55,000, respectively. Each son used $35,000 of his bonus to reduce the principal owed on the note to Melton. John and David each paid income taxes on their bonus. On December 29, 1986, Melton assigned the note to The Melton Company in partial payment of an existing debt that he owed the company.

One year later, on December 24, 1987, Melton gave John and David each forty more shares of Class B stock of The Melton

---

[2] The note was not nonrecourse and it expressly provided that each maker was personally responsible for the full amount of the note and for attorney's fees, and that matured unpaid principal and interest bore 18 percent per annum interest.

4

Company. On December 26, 1987, Melton gave each son another 106 shares of Class A stock and 299 shares of Class B stock.

On January 28, 1988, both John and David received a 1987 year-end bonus of $250,000 from The Melton Company. They each paid income taxes on their bonus. On January 29, 1988, Melton sold to John and David each 280 shares of Class B stock of The Melton Company. John and David paid the remaining balance due on the note the same day. Throughout the course of the indebtedness under the note, John and David had continued to make monthly payments. The Melton Company continued to make annual, year-end bonuses to both John and David long after the note was retired.

On December 25, 1989, nearly two years after the note had been paid in full, Melton gave John and David each thirty-five shares of Class B stock of The Melton Company. As a result of these gifts, on December 26, 1989, Melton owned fifty percent of the Class A stock of The Melton Company and no Class B stock. John and David each owned twenty-five percent of the Class A stock and fifty percent of the Class B stock. The ownership structure remained fixed at these levels until Melton's death.

Melton died testate on May 25, 1991, at the age of sixty-seven, more than six years after the sale of the remainder interest to the Wheelers and more than three years after the note had been paid in full. The cause of death was heart failure. Melton had suffered from coronary artery disease and arteriosclerosis for approximately ten years. The undisputed evidence, however, was that Melton's death was not (and was not thought to be) imminent in

5

July 1984 when he sold the remainder interest to the Wheelers (nor is there any evidence that it was ever imminent before 1991).

Melton's will and codicil were admitted to probate and John was appointed the independent executor of the estate. John timely filed an estate tax return reporting a gross estate of $581,106, and an estate tax liability of $199,936 (which was tendered with the return). The gross estate, as reported on the return, did not include any amount for the ranch, thus reflecting the estate's position that Melton had no interest in the ranch at his death.

The IRS subsequently issued its "Report of Estate Tax Examination Changes," taking the position that, under sections 2036(a) and 2043(a) of the Internal Revenue Code (IRC or Code),[3] the Melton estate should have included in the gross estate the difference between the date-of-death value of the ranch, $1,074,200,[4] and the consideration paid by the sons for the remainder interest, $337,790.18 (treated by the IRS as $338,000). Accordingly, the IRS determined that an additional $736,200 ($1,074,200 less $338,000) should have been included in the gross estate for the ranch. As a result, the IRS issued an estate tax notice of deficiency in the amount of $320,831. The Melton estate paid the asserted deficiency and filed a timely claim for refund. When the IRS did not allow the refund within the prescribed six

---

[3]    See note 6 *infra* and accompanying text.

[4]    The value of the ranch had declined by $240,000 since the date of the sale of the remainder interest to John and David.
    The IRS has never questioned that the fair market value of the ranch was $1,314,200 immediately before the July 13, 1984, deed to the Wheelers.

6

months, the Melton estate commenced the instant action in the United States District Court for the Western District of Texas, San Antonio Division, seeking a refund of the additional estate tax assessed and paid, plus interest.

## II.

Before the district court, the parties stipulated to the facts as set forth above and agreed to resolution of the issues by cross-motions for summary judgment. In its motion, the government contended that the series of transactions between Melton and his sons were part of a testamentary plan designed to shield most of the estate from taxation. The Melton estate argued that a sale of a remainder interest for its actuarial value comes within the "bona fide sale for an adequate and full consideration" exception to section 2036(a) and therefore the ranch was properly excluded from the gross estate.

The magistrate judge issued a report recommending that the government's motion be granted. The district court, without any discussion or explanation, overruled the estate's objections to the magistrate judge's report, accepted, approved, and adopted all the magistrate judge's findings and conclusions, and entered judgment for the government.

The magistrate judge, observing that the "classic case" envisioned by section 2036(a) was "a purported gift with a retained life estate in the donor," rejected the Melton estate's contention that the sale of the remainder interest in the ranch for its actuarial value constituted a "bona fide sale for adequate and full

7

consideration," and opined that the date-of-death value of the ranch——less the consideration paid by the sons——must be included in the gross estate. The magistrate judge's conclusion was premised on two principal bases. First, the magistrate judge found persuasive the United States Claims Court's decision in *Gradow v. United States*, 11 Cl. Ct. 808 (1987), *aff'd*, 897 F.2d 516 (Fed. Cir. 1990), and embraced its determination that, for the purposes of section 2036(a), the value received by the decedent must be compared to the value of the entire underlying property rather than the present value of the future interest transferred. Second, the magistrate judge concluded that the sale of the remainder interest was not a "bona fide sale" as envisioned by the exception to section 2036(a), noting that "[a]lthough death was not imminent in 1984, it is reasonable to assume that Melton contemplated his own death and the disposition of his estate at the time of the transfer of his homestead to his sons in July, 1984." Accordingly, the magistrate judge, viewing the evidence "as a whole," concluded that the series of transactions between Melton and his sons constituted "a single transaction intended to avoid the payment of estate taxes," tainting the sale of the remainder interest in the ranch and precluding the transaction from being "bona fide" under section 2036(a).[5]

Melton's estate appeals.

---

[5] The magistrate judge and district court ruled in favor of the estate on a wholly unrelated issue concerning the valuation of the estate's stock in The Melton Company. That issue is not involved in this appeal.

8

I.

The case below was decided on cross-motions for summary judgment and on stipulated facts. A grant of summary judgment is subject to *de novo* review. *Browning v. City of Odessa*, 990 F.2d 842, 844 (5th Cir. 1993). Where, as here, the essential facts are not in dispute, our review is limited to whether the government or the Melton estate is entitled to judgment as a matter of law. *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Aries Marine Corp.*, 932 F.2d 442, 444 (5th Cir. 1991).

Central to this case is section 2036(a) of the Code, which provides:

> "The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (*except in case of a bona fide sale for an adequate and full consideration in money or money's worth*), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—
> (1) the possession or enjoyment of, or the right to the income from, the property, or
> (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom." (Emphasis added).[6]

---

[6] See also I.R.C. § 2043(a), which provides:

> "If any one of the transfers, trusts, interests, rights, or powers enumerated and described in sections 2035 to 2038, inclusive, and section 2041 is made, created, exercised, or relinquished for a consideration in money or money's worth, but is not a bona fide sale for an adequate and full consideration in money or money's worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on

The estate concedes that the fee simple value of the ranch would have to have been brought back into the estate had the remainder been transferred to the Wheelers without consideration or for an inadequate consideration. However, the Wheelers paid Melton for the remainder interest transferred an amount which the government concedes is equal to (indeed slightly in excess of) the then fair market value of the fee simple interest in the ranch multiplied by the fraction listed in the Treasury Regulations for valuing a remainder following an estate for the life of a person of Melton's age. *See* 26 C.F.R. § 25.2512-5(A). The estate contends that accordingly under the parenthetical clause of section 2036(a) the ranch is not brought back into the estate, as Melton was paid full value for the transferred remainder. Indeed, there is no evidence to the contrary. The government, however, contends that because Melton was paid for the remainder interest an amount indisputably less than the value of the full fee interest, that therefore the parenthetical clause of section 2036(a) cannot apply, and hence the ranch must be brought back into the estate.

This case thus ultimately turns on whether the phrase "adequate and full consideration" as used in the italicized parenthetical clause of section 2036(a) is to be applied in reference to the value of the remainder interest transferred, as the estate contends, or in reference to the value of the full fee simple interest which the transferor had immediately before the

account of such transaction, over the value of the consideration received therefor by the decedent."

10

transfer, as the government contends.  We note that for this purpose the language of section 2036(a) makes no distinction between transfers of remainders following retained life estates and transfers of remainders following retained estates for a specified term of years (or other period ascertainable without reference to the transferor's death) where the transferor dies before the end of the term.  Similarly, no such distinction is made between transfers to natural objects of the transferor's bounty and transfers to those who are strangers to the transferor.

That the proper construction of section 2036(a)'s "adequate and full consideration" has presented taxpayers, the IRS, and the courts with such persistent conceptual difficulty can be explained, in large part, by the absence of a statutory definition of the phrase combined with the consistently competing interests of all tax litigants——the government and the taxpayer.  The crux of the problem has been stated as follows:

> "Because the actuarial value of a remainder interest is substantially less than the fair market value of the underlying property, the sale of a remainder interest for its actuarial value is viewed by many as allowing the taxpayer to transfer property to the remainderman for less consideration than is required in an outright sale. Consequently, the sale of a remainder interest for its actuarial value, although such value represents the fair market value of the remainder interest, raises the question of whether the seller has been adequately compensated for the transfer of the underlying property to the remainderman.  If the actuarial value of the remainder interest does not represent adequate compensation for the transfer of the underlying property to the remainderman, the taxpayer may be subject to both the gift tax and the estate tax. . . .  If the taxpayer holds the retained interest until death, section 2036(a) of the [Code] pulls the underlying property back into the taxpayer's gross estate, unless the transfer is a bona fide sale for adequate and full consideration."  Martha

11

W. Jordan, *Sales of Remainder Interests: Reconciling Gradow v. United States and Section 2702*, 14 Va. Tax Rev. 671, 673 (1995).

Both parties agree that, for the purposes of the gift tax (section 2512 of the Code), consideration equal to the actuarial value of the remainder interest constitutes adequate consideration. *See also* Treas. Reg. § 25.2512-5(A). For estate tax purposes, however, authorities are split. Commentators have generally urged the same construction should apply, *see, e.g.*, Jordan, *supra;* Steven A. Horowitz, *Economic Reality In Estate Planning: The Case for Remainder Interest Sales*, 73 Taxes 386 (1995); Jeffrey N. Pennell, *Cases Addressing Sale of Remainder Wrongly Decided*, 22 Est. Plan. 305 (1995), and the Third Circuit has held that "adequate and full consideration" under section 2036(a) is determined in reference to the value of the remainder interest transferred, not the value of the full fee simple interest in the underlying property. *D'Ambrosio v. Commissioner*, 101 F.3d 309 (3d Cir. 1996), *cert. denied*, 117 S.Ct. ___, 1997 WL 134397 (U.S.) (May 19, 1997). On the other hand, *Gradow v. United States*, 11 Cl. Ct. 808 (1987), *aff'd,* 897 F.2d 516 (Fed. Cir. 1990), and its faithful progeny *Pittman v. United States*, 878 F. Supp. 833 (E.D.N.C. 1994), and *D'Ambrosio v. Commissioner*, 105 T.C. 252 (1995), *rev'd* 101 F.3d 309 (3d Cir. 1996), *cert. denied*, 117 S.Ct. ___, 1997 WL 134397 (U.S.) (May 19, 1997), have stated that a remainder interest must be sold for an amount equal to the value of the full fee simple interest in the underlying property in order to come within the parenthetical exception clause of section 2036(a). This Court has

yet to address the precise issue.

## II.

A.  *Gradow v. United States* and the Widow's Election Cases

As the government's position rests principally on an analogy offered by the Claims Court in *Gradow*, a preliminary summary of the widow's election mechanism in the community property context is appropriate.

In a community property state, a husband and wife generally each have an undivided, one-half interest in the property owned in common by virtue of their marital status, with each spouse having the power to dispose, by testamentary instrument, of his or her share of the community property.  Under a widow's election will, the decedent spouse purports to dispose of the entire community property, the surviving spouse being left with the choice of either taking under the scheme of the will or waiving any right under the will and taking his or her community share outright.  One common widow's election plan provides for the surviving spouse to in effect exchange a remainder interest in his or her community property share for an equitable life estate in the decedent spouse's community property share.

In *Gradow*, Mrs. Gradow, the surviving spouse, was put to a similar election.  If she rejected the will, she was to receive only her share of the community property.  *Id.* 11 Cl. Ct. at 809. If she chose instead to take under her husband's will, she was required to transfer her share of the community property to a trust whose assets would consist of the community property of both

13

spouses, with Mrs. Gradow receiving all the trust income for life and, upon her death, the trust *corpus* being distributed to the Gradows' son. *Id.* Mrs. Gradow chose to take under her husband's will and, upon her death, the executor of her estate did not include any of the trust assets within her gross estate. *Id.* The executor asserted that the life estate received by Mrs. Gradow was full and adequate consideration under section 2036(a) for the transfer of her community property share to the trust, but the IRS disagreed. *Id.* Before the Claims Court, the parties stipulated that the value of Mrs. Gradow's share of the community property exceeded the actuarial value of an estate for her life in her husband's share. *Id.* However, the estate contended that the value of the life estate in the husband's share equaled or exceeded the value of the *remainder* interest in Mrs. Gradow's share. The Claims Court did not clearly resolve that contention because it determined that the consideration flowing from Mrs. Gradow was "the entire value of the property she placed in the trust, *i.e.*, her half of the community property," and that thus the life estate was inadequate consideration, so the exception to section 2036(a) was unavailable. *Id*. at 810.

The court in *Gradow* concluded that the term "property" in section 2036(a) referred to the entirety of that part of the trust *corpus* attributable to Mrs. Gradow. *Id.* at 813. Therefore, according to the court, if the general rule of section 2036(a) were to apply, the date-of-death value of the property transferred to the trust *corpus* by Mrs. Gradow—rather than the zero date-of-death

14

value of her life interest in that property——would be included in her gross estate. *Id.* Citing "[f]undamental principles of grammar," the court concluded that the bona fide sale exception must refer to adequate and full consideration for the property placed into the trust and not the remainder interest in that property. *Id.*

Fundamental principles of grammar aside, the *Gradow* court rested its conclusion equally on the underlying purpose of section 2036(a), observing that:

> "The only way to preserve the integrity of the section, then, is to view the consideration moving from the surviving spouse as that property which is taken out of the gross estate. In the context of intra-family transactions which are plainly testamentary, it is not unreasonable to require that, at a minimum, the sale accomplish an equilibrium for estate tax purposes." *Id.* at 813-14.

In support of its equilibrium rule, the *Gradow* court cited precedent in the adequate and full consideration area, most notably *United States v. Allen*, 293 F.2d 916 (10th Cir.), *cert. denied*, 82 S.Ct. 378 (1961).

It is not our task to address the merits of *Gradow*'s analysis of how section 2036(a) operates in the widow's election context but rather to determine whether the *Gradow* decision supports the construction urged by the government in the sale of a remainder context. We conclude that the widow election cases present factually distinct circumstances that preclude the wholesale importation of *Gradow*'s rationale into the present case.

As noted, a widow's election mechanism generally involves an arrangement whereby the surviving spouse exchanges a remainder

15

interest in her community property share for a life estate in that of her deceased spouse. Usually, as in *Gradow*, the interests are in trust. Necessarily, the receipt of an equitable life estate in the decedent-spouse's community property share does little to offset the reduction in the surviving spouse's gross estate caused by the transfer of her remainder interest. It is precisely this imbalance that the commentators cited in *Gradow*––and the "equilibrium rule" gleaned from *United States v. Allen*––recognized as the determinative factor in the widow's election context. Because a surviving spouse's transfer of a remainder interest depletes the gross estate, there can be no "bona fide sale for an adequate and full consideration" unless the gross estate is augmented commensurately. *See* Charles L. B. Lowndes, *Consideration and the Federal Estate and Gift taxes: Transfers for Partial Consideration, Relinquishment of Marital Rights, Family Annuities, the Widow's Election, and Reciprocal Trusts*, 35 Geo. Wash. L. Rev. 50, 66 (1966); Stanley M. Johanson, *Revocable Trusts, Widow's Election Wills, and Community Property: The Tax Problems*, 47 Tex. L. Rev. 1247, 1283-84 (1969) ("But in the widow's election situation, the interest the wife receives as a result of her election-transfer is a life estate in her husband's community share––an interest which, by its nature, will not be taxed in the wife's estate at her death. It appears that the wife's estate is given a consideration offset for the receipt of an interest that did not augment her estate."). Accordingly, we need not address the issue whether the value or income derived from a life estate in

16

the decedent-spouse's community property share can ever constitute adequate and full consideration. For our purposes it is enough to observe that, in most cases, the equitable life estate received by the surviving spouse will not sufficiently augment her gross estate to offset the depletion caused by the transfer of her remainder interest.[7] This depletion of the gross estate prevents the

---

[7] Commentators have disagreed about the wisdom of a "consideration offset" in the widow's election context. *See* Lowndes, *supra*; Johanson, *supra*. This Court's *Vardell* decision has been described as mandating the inclusion of all of the surviving spouse's transferred property in her gross estate, subject only to such credits, if any, as may be due under section 2043(a) (quoted in note 6, *supra*). *See* Lowndes, *Consideration and the Federal Estate and Gift Taxes*, at 67-68 (discussing *Estate of Vardell v. Commissioner*, 307 F.2d 688, 692-94 (5th Cir. 1962)). Accordingly, the amount of the surviving spouse's subsequent gross estate enhancement under section 2036(a) caused by her retained life estate would be "offset" pursuant to section 2043(a). *Vardell*, 307 F.2d at 693. However, it is the *date-of-death* value of the (now-dead) surviving spouse's remainder interest that is offset by the actuarial (date-of-election) value of her life estate in the decedent spouse's community property share under section 2043(a). *Id.* at 693-94.

*Vardell* did not address the date-of-election value of the surviving spouse's remainder interest, although there are indications that the life estate in the husband's community property share was worth less than the transferred remainder. *Vardell*, 307 F.2d at 692 ("Nor are we concerned with a valuation of the property interest transferred by Mrs. Vardell since the very purpose of § 2036 and the related sections is to include all of such property in her gross estate subject to such credits, if any, as may be due."). The *Vardell* court, therefore, does not appear to have been confronted with a situation where the life estate received by the surviving spouse was equal or greater in value than the remainder interest transferred. *Id.; see also United States v. Gordon*, 406 F.2d 332 (5th Cir. 1969) (involving the transfer of a wife's remainder interest for a life estate in a trust worth less than the transferred remainder). *Gradow*, however, apparently did present such a situation, but the Claims Court chose not to address valuation of the transferred interest at the date of election. Other courts, however, have followed approaches that call for just such a valuation.

The Ninth Circuit, for example, embraced a construct in the widow's election context that calculates adequate consideration under section 2036(a) by comparing the actuarial (date-of-election)

17

operation of the adequate and full consideration exception to section 2036(a).[8]   Had the court in *Gradow* limited its discussion of section 2036(a)'s adequate and full consideration exception to the widow's election context, the nettlesome task of distinguishing its blanket rule of including the value of the full fee interest on the underlying property when a remainder interest is transferred

---

value of the remainder interest in the surviving spouse's share of her community property with the actuarial (date-of-election) value of the life estate in the decedent spouse's community property share. *Estate of Christ v. Commissioner*, 480 F.2d 171, 172 (9th Cir. 1973). *If*, at the date of election, the life estate in the decedent spouse's community property share received by the surviving spouse is worth less than the then actuarial value of her remainder interest, then the amount of her subsequent gross estate enhancement under section 2036(a) caused by her retained life estate is "offset" pursuant to section 2043(a). *Id.* *If* this point is reached, then the analysis necessarily follows *Vardell*: under section 2043(a) the *date-of-death* value of the (now-dead) surviving spouse's remainder interest which is included in the estate is offset by the actuarial (date-of-election) value of her life estate in the decedent spouse's community property share. *Id.* *But see United States v. Past*, 347 F.2d 7, 13-14 (9th Cir. 1965) (stating that the date-of-election value of the amount the surviving spouse receives under a trust must be measured against the entire underlying fee amount she transferred to the trust and not the remainder interest therein); *Estate of Gregory v. Commissioner*, 39 T.C. 1012, 1022 (1963) (same).

The Third Circuit in *D'Ambrosio* found no reason why a court's analysis of a widow's election transaction should not compare the actuarial (date-of-election) value of the remainder interest transferred to the actuarial (date-of-election) value of the life estate received. 101 F.3d at 313-14. Accordingly, the Third Circuit found both *Gregory* and *Past* wrongly decided. Although we find the Third Circuit's analysis persuasive, we see little utility in revisiting the federal estate tax ramifications of the widow's election device in light of the post-1981 unlimited marital deduction (for which the typical election devise would not qualify). *See* IRC § 2056.

[8]      In the widow's election context, the remaindermen are, essentially, third-party beneficiaries of the widow's election transaction. We also need not, and do not, address the significance of this configuration on the operation of the "adequate and full consideration" exception to section 2036(a).

might be somewhat easier. In *dicta*, however, and apparently in response to a hypothetical posed by the taxpayer, the *Gradow* court let loose a response that, to say the least, has since acquired a life of its own. The entire passage——and the source of much consternation——is as follows:

> "Plaintiff argues that the defendant's construction would gut the utility of the 'bona fide sales' exception and uses a hypothetical to illustrate his point. In the example a 40-year-old man contracts to put $100,000.00 into a trust, reserving the income for life but selling the remainder. Plaintiff points out that based on the seller's life expectancy, he might receive up to $30,000.00 for the remainder, but certainly no more. He argues that this demonstrates the unfairness of defendant insisting on consideration equal to the $100,000.00 put into trust before it would exempt the sale from § 2036(a).
> There are a number of defects in plaintiff's hypothetical. First, the transaction is obviously not testamentary, unlike the actual circumstances here. In addition, plaintiff assumes his conclusion by focusing on the sale of the remainder interest as the only relevant transaction. Assuming it was not treated as a sham, the practical effect is a transfer of the entire $100,000.00, not just a remainder. More importantly, however, if plaintiff is correct that one should be able, under the 'bona fide sale' exception to remove property from the gross estate by a sale of the remainder interest, the exception would swallow the rule. A young person could sell a remainder interest for a fraction of the property's worth, enjoy the property for life, and then pass it along without estate or gift tax consequences."
> *Gradow*, 11 Cl. Ct. at 815.

The Claims Court went on to conclude that "[t]he fond hope that a surviving spouse would take pains to invest, compound, and preserve inviolate all the life income from half of a trust, knowing that it would thereupon be taxed without his or her having received any lifetime benefit, is a slim basis for putting a different construction on § 2036(a) than the one heretofore consistently adopted." *Id.* at 816.

19

One can only imagine the enthusiasm with which the IRS received the news that, at least in the view of one court, it would not have to consider the time value of money when determining adequate and full consideration for a remainder interest.[9] Subsequent to the *Gradow* decision, the government has successfully used the above quoted language to justify inclusion in the gross estate of the value of the full fee interest in the underlying property even where the transferor sold the remainder interest for its undisputed actuarial value. *See Pittman v. United States*, 878 F. Supp. 833 (E.D.N.C. 1994). *See also D'Ambrosio v. Commissioner*, 105 T.C. 252 (1995), *rev'd*, 101 F.3d 309 (3d Cir. 1996), *cert. denied*, 117 S.Ct. ___, 1997 WL 134397 (U.S.) (May 19, 1997).

*Pittman* (and the Tax Court's decision in *D'Ambrosio)* presents a conscientious estate planner with quite a conundrum.  If the

___

[9] Actually, one need leave little to the imagination.  Within a year of the Federal Circuit's affirmance of *Gradow*, 897 F.2d 516 (Fed. Cir. 1990), the IRS reversed its consistent practice of calculating adequate and full consideration for the sale of remainder interests under section 2036(a) by using the actuarial factors set forth in the Treasury Regulations—*see, e.g.*, Rev. Rul. 80-80, 1980-12 I.R.C. 10 ("[T]he current actuarial tables in the regulations shall be applied if valuation of an individual's life interest is required for purposes of the federal estate or gift taxes unless the individual is known to have been afflicted, at the time of transfer, with an incurable physical condition that is in such an advanced stage that death is clearly imminent."); Priv. Ltr. Rul. 78-06-001 (Oct. 31, 1977); Priv. Ltr. Rul. 80-41-098 (Jul. 21, 1980); Tech. Adv. Mem. 81-45-012 (Jul. 20, 1981)—and began to cite the *Gradow dicta* as controlling, *see, e.g.*, Priv. Ltr. Rul. 91-33-001 (Jan. 31, 1991) ("For purposes of section 2036(a), in determining whether an adequate and full consideration was received by a decedent upon transferring an interest in property, the consideration received by the decedent is compared to the value of the underlying property rather than the value of the transferred interest; the consideration thus being a replacement of the property otherwise includible in the decedent's gross estate.") (citing *Gradow*, 11 Cl. Ct. 808).

taxpayer sells a remainder interest for its actuarial value as calculated under the Treasury Regulations, but retains a life estate, the value of the full fee interest in the underlying property will be included in his gross estate and the transferor will incur substantial estate tax liability under section 2036(a). If the taxpayer chooses instead to follow *Gradow,* and is somehow able to find a willing purchaser of his remainder interest for the full fee-simple value of the underlying property, he will in fact avoid estate tax liability; section 2036(a) would not be triggered. The purchaser, however, having paid the fee-simple value for the remainder interest in the estate, will have paid more for the interest than it was worth. As the "adequate and full consideration" for a remainder interest under section 2512(b) is its actuarial value, the purchaser will have made a gift of the amount paid in excess of its actuarial value, thereby incurring gift tax liability.[10] Surely, in the words of Professor Gilmore, this "carr[ies] a good joke too far."[11]

B. *United States v. Allen*

The problem with the *Gradow dicta* is that, in its effort to escape the hypothetical posed by the taxpayer, it lost sight of the

---

[10] *See* Jordan, *Sales of Remainder Interests*, at 682. The special valuation rules of the subsequently-enacted section 2702(a) do not operate to frustrate this unfortunate result. Section 2702(a)'s special valuation rules address whether a gift has been made by the transferor, not the purchaser. Jordan, *supra.*

[11] Grant Gilmore, *The Uniform Commercial Code: A Reply to Professor Beutel*, 61 Yale L.J. 364, 375-76 (1952) (characterizing, in an entirely different context, the same type of heads-I-win-tails-you-lose scheme).

very principle the court was trying to apply; namely, the notion that adequate and full consideration under the exception to section 2036(a) requires only that the sale not deplete the gross estate. *Gradow* was correct in observing that "it is not unreasonable to require that, at a minimum, the sale accomplish an equilibrium for estate tax purposes." *Gradow*, 11 Cl. Ct. at 813-14. Indeed, *United States v. Allen*, 293 F.2d 916, when properly construed, stands simply for that proposition.

In *Allen*, the decedent had created, and made a donative transfer of assets to, an irrevocable *inter vivos* trust, reserving a three-fifth interest in the income for life, her two children to receive the remainder in the entire corpus and the other two-fifths of the income. *Id.* at 916. Thereafter, being advised that her retention of the three-fifths of the life estate would result in the inclusion of three-fifths of the trust corpus in her gross estate at her death, the decedent sold her life estate to one of her children for a little over its actuarial value. She died shortly thereafter. *Id.* at 916-17. The trial court, although finding that the transfer of the life estate was made in contemplation of death, found that the consideration paid for it was "adequate and full," thereby removing the property from the taxpayer's estate. The Tenth Circuit reversed. Using the language that *Gradow* later quoted, the Tenth Circuit determined that the adequacy of the consideration paid for the life estate should be measured not against the interest received by the purchaser, but rather by the amount that would prevent depletion of the

22

transferor's gross estate.  *Id.* at 918 & n.2.

> "It does not seem plausible, however, that Congress intended to allow such an easy avoidance of the taxable incidence befalling reserved life estates.  This result would allow a taxpayer to reap the benefits of property for his lifetime and, in contemplation of death, sell only the interest entitling him to the income, thereby removing all of the property which he has enjoyed from his gross estate.  Giving the statute a reasonable interpretation, we cannot believe this to be its intendment.  It seems certain that in a situation like this, Congress meant the estate to include the corpus of the trust or, in its stead, an amount equal in value."  *Id.* at 918; *but cf.* 5 Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 126.3.5, at 126-27 (1993) (noting that *Allen* may have "stretch[ed] the statutory language in a good cause").

Crucial to a proper reading of *Allen* is the factual basis of the Tenth Circuit's holding.  The decedent, Maria Allen, had gratuitously transferred a remainder interest in an irrevocable trust to her two children, reserving a life estate in three-fifths for herself.  Under section 811 of the 1939 Internal Revenue Code (the precursor to sections 2035 and 2036), this transaction retained the value of the full fee interest in three-fifths of the trust corpus in Maria Allen's gross estate for estate tax purposes.  For this very reason, Maria Allen, at age seventy-eight, subsequently sold to one of her children her three-fifths life estate for an amount ($140,000) slightly in excess of its actuarial value ($135,000).  The intended result of this sale was to remove the value of the entire fee interest in three-fifths of the trust corpus from Maria Allen's gross estate; as long as she retained the life estate, section 811 would pull the date-of-death value of her three-fifths remainder interest ($900,000) into her gross estate.  Therefore, *unlike* the hypothetical addressed in *Gradow* or the facts

23

of the case here presented, the actuarial value of the transferred interest, the life estate, would *not* have prevented depletion of the gross estate in *Allen*.  *See* Jordan, *Sales of Remainder Interests*, at 699 ("The conclusion in *Allen* that adequate consideration for the sale of a retained life estate equals the value of the trust corpus includible in the gross estate derives from the special punitive nature of section 2035 of the Code . . . , and not from the proposition that the transfer of a split-interest removes the entire underlying property from the gross estate.").[12]

---

[12] *Allen* can only properly be understood as a "contemplation of death" case.  As noted, the trial court found the life estate was transferred in contemplation of death, and this finding was not disturbed on appeal.  *See D'Ambrosio*, 101 F.3d at 312 (transfer of life estate in *Allen* "a testamentary transaction with palpable tax evasion motive")*;* 5 Bittker & Lokken*, Federal Taxation of Income, Estates and Gifts*, 126-97 n.105 (2d ed. 1993) (describing *Allen* as situation where the life estate transfer was "in contemplation of death").  Treating the *Allen* life estate transfer as in "contemplation-of-death" under the predecessor to section 2035 (IRC 1939, § 811(c)(1)(A)) resulted in the life estate being brought back into Maria Allen's estate*;* that, in turn, made the entire fee in the three-fifths of the corpus subject to the predecessor to section 2036(a), and hence within Maria Allen's estate, just as if Maria Allen had never disposed of the life estate that she retained when she created the trust (and donated to it the assets forming its corpus) in a transaction concededly covered by the predecessor to section 2036(a) and not subject to any exception thereto.  In determining whether the transfer of the life estate was for an adequate and full consideration, so as to thereby be within the exception to the "contemplation-of-death" provision, comparison was made between the consideration ($140,000) for that transfer and the amount by which the estate would have been depleted ($900,000 as the value of the full fee interest in three-fifths of the corpus or $765,000 as the value of the remainder interest in three-fifths of the corpus) had the life estate not been transferred*;* and this comparison demonstrated that the consideration was not adequate and full.  Here, by contrast, the deed from Melton to the Wheelers, unlike Maria Allen's transfer to the trust, was for an adequate and full consideration, because immediately thereafter Wheeler owned assets having a value equal to what he owned immediately before.

24

Thus the Melton deed was not within section 2036(a). Moreover, here there is no transaction subject to section 2035 (the successor to the contemplation-of-death provision of IRC 1939 § 811(c)(1)(A)) as the Melton deed was executed (and the consideration fully paid) more than three years before Melton's death.

Judge Breitenstein's opinion concurring in the result in *Allen* appears to suggest that *Allen* does not depend on the transfer of the life estate having been made in contemplation of death, but rather on the proposition that no transfer of the life estate could ever "undo" the estate tax consequences of the earlier donative transfer to the trust with a life estate retained, which was concededly within the predecessor to section 2036(a) and not within the exception thereto. *Id*. at 918 ("As I read the statute the tax liability arises at the time of the inter vivos transfer under which there was a retention of the right to income for life. The disposition thereafter of that retained right does not eliminate the tax liability."). The correctness of this view is of perhaps only tenuous relevance here, as here the deed from Melton to the Wheelers is within the section 2036(a) exception. In any event, we note that neither the *Allen* majority nor, so far as we are aware, any other authority, has embraced Judge Breitenstein's view as thus broadly stated. See, for example, 5 Bittker & Lokken, *supra*, at 126-27:

> ". . . if the decedent transferred property subject to a retained life estate but later (more than three years before death) relinquished the life estate, §2036(a)(1) does not apply, even though the decedent "retained" the right to the income "for life."[104] An unqualified transfer of property during life—even though effected in two or more steps—has long been recognized as being exclusively within the jurisdiction of the gift tax unless the final step was taken in contemplation of death or within three years of death.[105]
>
> . . . .
>
> [104] Cuddihy's Est. v. CIR, 32 TC 1171, 1177 (1959) (retained right to trust income relinquished during decedent's life; alternative ground). See Ware's Est. v. CIR, 480 F2d 444 (7th Cir. 1973) (decedent-grantor was trustee with power to accumulate or distribute trust income, but resigned as trustee many years before dying; no inclusion under §2036).
>
> [105] If a §2036(a) right was relinquished within three years of death, the property is included in the gross estate, apparently as though the right has not been relinquished. IRC §2035(d)(2), discussed supra ¶126.4.2. For the result under prior law where an otherwise taxable right was relinquished in contemplation of death, see US v. Allen, 293 F2d 916 (10th Cir.), cert. denied, 368 US 944 (1961) (sale of life estate for inadequate

C.  *In Pari Materia*

    As alluded to above, significant problems arise when "adequate and full consideration" is given one meaning under section 2512 and quite another for the purposes of section 2036(a).  In a pair of companion cases in 1945, the Supreme Court set forth the general principle that, because the gift and estate taxes complement each other, the phrase "adequate and full consideration" must mean the same thing in both statutes.  *See Merrill v. Fahs*, 65 S.Ct 655, 656 (1945) ("'The gift tax was supplementary to the estate tax.  The two are *in pari materia* and must be construed together.'") (quoting *Estate of Sanford v. Commissioner*, 60 S.Ct. 51, 56 (1939)); *Commissioner v. Wemyss*, 65 S.Ct. 652 (1945); *Estate of Friedman v. Commissioner*, 40 T.C. 714, 718-19 (1963) ("The phrase 'an adequate

_____

consideration); Rev. Rul. 56-324, 1956-2 CB 999."

    The current structure of section 2035 seems to confirm the "contemplation-of-death" approach implicit in *Allen*.  Under section 2035(a), transfers within three years of death—the substitute for the former "contemplation-of-death" provision—are included in the gross estate.  Under section 2035(b)(1), transfers for adequate and full consideration are exempted from section 2035(a).  Under section 2035(d)(1), estates of decedents dying after December 31, 1981, are exempted from section 2035(a), but, by the terms of section 2035(d)(2), that exemption "shall not apply to a transfer of an interest in property which is included in the value of the gross estate under sections 2036, 2037, 2038, or 2042 or would have been included under any of such sections if such interest had been retained by the decedent."  See generally 5 Bittker & Lokken, *supra*, at 126-34, 126-35.

    Thus, were the *Allen* facts present today—and the court again held the life estate was not transferred for an adequate and full consideration—there would nevertheless be no inclusion of the fee interest in three-fifths of the trust corpus in Maria Allen's estate *if* she lived more than three years after her transfer of the life estate; if she did not live so long, the fee interest in the three-fifths of the trust corpus would be included in her estate by virtue of section 2035(a) as section 2035(d)(2) would prevent application of the section 2035(d)(1) exemption.

26

and full consideration in money or money's worth,' common to both the estate and gift tax statutes here pertinent, is to be given an 'identical construction' in regard to each of them.") (citing *Fahs*, 65 S.Ct. at 656).  In *Fahs*, the Court observed:

> "Correlation of the gift tax and the estate tax still requires legislative intervention.  [citations]  But to interpret the same phrases in the two taxes concerning the same subject matter in different ways where obvious reasons do not compel divergent treatment is to introduce another and needless complexity into this already irksome situation."  *Id*. at 657.

The "purpose" of gift and estate taxes was articulated clearly in *Wemyss*: "The section taxing as gifts transfers that are not made for 'adequate and full [money] consideration' aims to reach those transfers which are withdrawn from the donor's estate."  *Wemyss*, 65 S.Ct. at 655.  In *Wemyss*, the donor received no consideration in money's worth to replenish his estate for the transfer of stock to his bride, and therefore his estate was depleted by the amount of the transfer.  The bride's relinquishment of her interest in an existing trust provided no augmentation to the donor's estate.  The following rule emerges:  unless a transfer that depletes the transferor's estate is joined with a transfer that augments the estate by a commensurate (monetary) amount, there is no "adequate and full consideration" for the purposes of either the estate or gift tax.  We thus come full circle to the "equilibrium rule" set forth in *United States v. Allen* and cited in *Gradow*.

The problem that appears to have vexed the Claims Court in *Gradow* when it considered the remainder sale hypothetical posed by the taxpayer (and the *Pittman* district court and the Tax Court in

27

*D'Ambrosio* who chose to follow the *Gradow* approach) is that, believing themselves to be between the Scylla of estate tax evasion and the Charybdis of misconstruction of the gift tax statute, they looked for guidance to a line of estate tax decisions more confusing than the task they faced. In *Allen*, as was observed, the amount required to prevent depletion of the gross estate caused by the in contemplation of death sale of Maria Allen's retained life estate was indeed the value of the underlying estate, as that was the amount by which Maria Allen's gross estate was depleted. *See* note 12, *supra*, and accompanying text. *See also* Lowndes, *Consideration and the Federal Estate and Gift Taxes*, at 51 ("[T]he estate and gift taxes limit the consideration which will prevent a taxable transfer to an adequate and full consideration in money or money's worth, that is, to a consideration which will serve as a substitute for the transferred property in the transferor's taxable estate."). The actuarial value of Maria Allen's life estate simply would not, and did not, prevent the depletion of her estate. This concern is not implicated by the sale of a remainder interest for its actuarial value.

The sale of a remainder interest for its actuarial value does not deplete the seller's estate. "The actuarial value of the remainder interest equals the amount that will grow to a principal sum equal to the value of the property that passes to the remainderman at termination of the retained interest. To reach this conclusion, the tables assume that both the consideration received for the remainder interest and the underlying property are

28

invested at the table rate of interest, compounded annually." Jordan, *Sales of Remainder Interests*, at 692-93 (citing Keith E. Morrison, *The Widow's Election: The Issue of Consideration*, 44 Tex. L. Rev. 223, 237-38 (1965)). In other words, the actuarial tables are premised on the recognition that, at the end of the actuarial period, there is no discernible difference between (1) an estate holder retaining the full fee interest in the estate and (2) an estate holder retaining income from the life estate and selling the remainder interest for its actuarial value—in either case, the estate is not depleted. This is so because both interests, the life estate and the remainder interest, are capable of valuation. Recognizing this truism, the accumulated value of a decedent's estate is precisely the same whether she retains the fee interest or receives the actuarial value of the remainder interest outright by a sale prior to her actual death. *Id.* at 691-92; Morrison, *The Issue of Consideration*, at 237-38.

Two possible objections—which are more properly directed at the wisdom of accepting actuarial factors than at the result just described—should be addressed. The first, to paraphrase the Claims Court in *Gradow*, is that the fee interest holder, in such a situation, might squander the proceeds from the sale of the remainder interest and, therefore, deplete the estate. *See Gradow*, 11 Cl. Ct. at 816 (noting that "[t]he fond hope that a surviving spouse would take pains to invest, compound, and preserve inviolate all [proceeds from a sale of the remainder interest], knowing that it would thereupon be taxed without his or her having received any

29

lifetime benefit, is a slim basis" for holding the actuarial value of a remainder interest is adequate and full consideration under section 2036(a)).  This objection amounts to a misapprehension of the estate tax.[13]  Whether an estate holder takes the "talents" received from the sale of the remainder interest and purchases blue chip securities, invests in highly volatile commodities futures, funds a gambling spree, or chooses instead to bury them in the ground, may speak to the wisdom of the estate holder, *see Matthew 25:14-30*, but it is of absolutely no significance to the proper determination of whether, *at the time of the transfer*, the estate holder received full and adequate consideration under section 2036(a).  If further explanation is required, we point out that *Gradow* itself seems to have reached the same conclusion in an earlier portion of the opinion.  *See Gradow*, 11 Cl. Ct. at 813 ("Even if the consideration is fungible and easily consumed, at least theoretically the rest of the estate is protected from encroachment for lifetime expenditures.").  *See also* Jordan, *Sales of Remainder Interests*, at 695-96 & n.105; Morrison, *The Issue of Consideration*, at 236-44.

The second objection is no more availing.  If a sale of a remainder interest for its actuarial value—an amount, it is worth noting, that is nothing more than the product of the undisputed "fair market value" of the underlying estate multiplied by an actuarial factor designed to adjust for the investment return over

---

[13]     The Third Circuit likewise had "great difficulty understanding how [such a] transaction could be abusive." *D'Ambrosio*, 101 F.3d at 316.

the actuarial period——constitutes adequate and full consideration under section 2036(a), then the estate holder successfully "freezes" the value of the transferred remainder at its date-of-transfer value. Accordingly, any post-transfer appreciation of the remainder interest over and above the appreciation percentage anticipated by the actuarial tables passes to the remainderman free of the estate tax. But, of course, this is a problem only if the proceeds of the sale are not invested in assets which appreciate as much (or depreciate as little) as the remainder. Moreover, those who recall the Great Depression, as well as more recent times,[14] know that assets frequently do not appreciate. Indeed, Melton's ranch did not appreciate, but rather at his death was worth less than eighty-two percent of its value when the remainder was sold. Finally, to the extent that this "freeze" concern is legitimate, we note, as discussed *infra*, that Congress, through the passage in 1987 of former section 2036(c) and, later, its 1990 repeal and the enactment then of section 2702, has spoken to the issue.

D. Section 2036(a)'s Bona Fide Sale Requirement

The magistrate judge below, and the government at oral argument, asserted that the requirement that a sale for adequate and full consideration be "bona fide" under section 2036(a) takes on a heightened significance in the context of intrafamily transfers.

---

[14] The situation in Texas not so long ago was aptly described by a colorful lawyer—whose name now unfortunately escapes memory—as one in which the phrase "rich Texan" metamorphosed almost overnight from a redundancy to an oxymoron.

"Although the presumption in an intrafamily transfer is that the transfer between related parties is a gift, the presumption that an intrafamily transaction is gratuitous 'may be rebutted by an affirmative showing that there existed at the time of the transaction a real expectation of repayment and intent to enforce the collection of the indebtedness.'" *Estate of Musgrove v. United States*, 33 Fed. Cl. 657, 662 (1995) (citations omitted); *accord Kincaid v. United States*, 682 F.2d 1220, 1225-26 (5th Cir. 1982); *Slappey Drive Ind. Park v. United States*, 561 F.2d 572, 584 n.21 (5th Cir. 1977); *Dillin v. United States*, 433 F.2d 1097, 1103 (5th Cir. 1970).

Heightened scrutiny serves the purpose of allowing inquiry beyond form to the substance of transactions in order to determine the appropriate tax consequences. But here, where the intrafamily transaction comports in substance with the government's own regulations, the government would have us take the opposite approach. The government argues that we should ignore the economic reality of a remainder interest sale and decide the tax issue based solely on the identity of the parties.

To the extent the "bona fide" qualifier in section 2036(a) has any independent meaning beyond requiring that neither transfers nor the adequate and full consideration for them be illusory or sham, it might be construed as permitting legitimate, negotiated commercial transfers of split-interests that would not otherwise qualify as adequate consideration using the actuarial table values set forth in the Treasury Regulations to qualify under the

32

exception.  Such a result comports with the same construction the term is given in the gift tax regulations.  The gift tax regulations prevent an "ironclad" operation of the gift tax statute from transforming every bad bargain into a gift by the losing party.  *See Weller v. Commissioner*, 38 T.C. 790, 805-07 (1962); 5 Bittker & Lokken, *Federal Taxation*, at 121-31.  *See also id*. at 126-20.  Accordingly, the term "bona fide" preceding "sale" in section 2036 is not, as the government seems to suggest, an additional wicket reserved exclusively for intrafamily transfers that otherwise meet the Treasury Regulations' valuation criteria.  The government implicitly asserts that the term "bona fide" in section 2036(a) permits the IRS to declare that the same remainder interest, sold for precisely the same (actuarial) amount but to different purchasers, would constitute adequate and full consideration for a third party but not for a family member.  This construction asks too much of these two small words.  In addition to arguing that "adequate and full consideration" means different things for gift tax purposes than it does for estate tax purposes, the government would also have us give "bona fide" not only a different construction depending on whether we are applying the gift or estate tax statute, but also different meanings depending upon the identity of the purchaser in a section 2036(a) transaction.  We do not believe that Congress intended, nor do we believe the language of the statute supports, such a construction.

Certainly an intrafamily transfer—like any other—must be a "bona fide sale" for the purposes of section 2036(a).  But

33

assuming, as we must here, that a family member purports to pay the appropriate value of the remainder interest,[15] the only possible grounds for challenging the legitimacy of the transaction are whether the transferor actually parted with the remainder interest and the transferee actually parted with the requisite adequate and full consideration.  Accordingly, we do not find convincing the government's position that the term "bona fide" as used in section 2036(a) presents an adequate basis for imposing a dual system of valuation under the statute.

E.  IntraFamily Transactions

At oral argument the government pursued a line of reasoning not fully anticipated by their brief's *Gradow*/no-bona-fide-transaction theory.  Stated concisely, the government asserted that, because the purpose of section 2036(a) is to reach those split-interest transfers that amount to testamentary substitutes and include the underlying asset's value in the gross estate, the adequate and full consideration for *intrafamily transfers*——which are generally testamentary in nature because the interest passes "to the natural objects of one's bounty in the next generation"——must be measured against the entire value of the

_____

[15]     The government conceded at oral argument:

> "If you accept that all that is to be valued is the residue [remainder interest], which is the taxpayer's position here——or the estate's position——we don't dispute that, for purposes of this case, its value was accurately computed by application of the tables.  Rather, we're saying that, in this context a different property should be valued. . . .  We're not suggesting that its a valuation question, we're looking at it from a different point of view."

34

underlying asset in order to accomplish section 2036(a)'s purpose.[16] This argument is necessarily at odds with *Gradow*'s "fundamental principles of grammar" approach that rested on a construction of the bona fide sale exception that did not purport to distinguish between either the identity or the subjective intent of the parties.[17] We reject the government's proffered construction as not supported by the statutory language.

Moreover, a policy-based argument to preclude intrafamily transfers of split-interests for full actuarial value if the transaction appears to have been undertaken in contemplation of death embraces a concept that the Congress chose to abandon twenty years ago—the notion that the subjective intent of an asset holder should determine the tax consequences of his transfer.

Given the similarity between the government's argument and the

---

[16]     Although stopping short of embracing a position that an intrafamily transfer can *never* meet the requirements of the bona fide sale exception, the only situation in which the government could conceive of an intrafamily transfer qualifying was a *Friedman*-type situation where the family members' interests are actively adverse. *See Estate of Friedman*, 40 T.C. 714 (1963) (involving settlement of a contentious will dispute).

[17]     We find no merit in the government's contention that the only logical way to make the government "whole" as contemplated by section 2036(a) is to include the entire value of the underlying asset. That which would make the estate "whole" is indeed, as the government observed, that which puts the government in the same position as if the transaction had never occurred. But where the transferor's estate receives the full actuarial value of the transferred interest—an amount, as discussed above, that the Treasury Regulations assume will compound to reach the full value of the fee interest by the transferor's death—the government is made whole. If the entire underlying asset is also pulled back into the estate, the government comes out ahead, for the section 2043(a) offset given for the amount paid when the remainder is transferred fails to recognize the interest assumptions underlying the actuarial tables.

old gift-in-contemplation-of-death scheme, a brief review is appropriate. Recognizing that the most obvious way to defeat the estate tax would be through *inter vivos* gifts, the estate tax, from its inception, contained a provision including in the gross estate certain *inter vivos* transfers "intended to take effect in possession or enjoyment" at or after the decedent's death and those made "in contemplation of death." 5 Bittker & Lokken, *supra,* at 126-30 (citing Revenue Act of 1916, Pub. L. No. 271, 39 Stat. 756). Although the Federal Gift Tax, enacted in 1932, reduced the tax avoidance possible through the use of *inter vivos* transfers, its lower rates and separate exemptions continued the need for estate tax treatment of gifts made in contemplation of death. *Id.* at 126-31. Accordingly, Congress enacted the predecessor to section 2035 "to reach *inter vivos* transfers of property used as substitutes for testamentary dispositions." *Hope v. United States*, 691 F.2d 786, 790 (5th Cir. 1982) (citing *United States v. Wells*, 51 S.Ct. 446, 451-52 (1931)). Death was "'contemplated' within the meaning of the statutory presumption if the dominant motive for the transfer [was] the creation of a substitute for testamentary disposition designed to avoid the imposition of estate taxes." *Id.* (citation omitted). In 1976, Congress amended section 2035 to omit the contemplation of death provision, placing in its stead an absolute rule including in the gross estate all gifts made by the decedent within three years of death.[18] The congressional intent—relevant

---

[18] The 1976 amendments also unified the rate schedules between the estate and gift taxes. Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1848.

36

to the present case as well——was patent:

> "Congress was troubled by the inordinate number of lawsuits by taxpayers who attempted to establish life motives for transfers otherwise taxable under the statute. The statutory change in section 2035 bore a rational relationship to a legitimate congressional purpose: *eliminating factbound determinations hinging upon subjective motive.*" *Estate of Ekins v. Commissioner*, 797 F.2d 481, 486 (7th Cir. 1986) (citing H.R. Rep. No. 94-1380, 94th Cong., 2d Sess. 12 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2897, 3366) (emphasis added)); *Hope*, 691 F.2d at 788 n.3 (same).

Section 2035 was amended again in 1981 to eliminate the three year rule, subject to certain exceptions, for persons dying after 1981. The Economic Recovery Act of 1981, Pub. L. 97-34, Title IV, §§ 403(b)(3)(B), 424(a), 95 Stat. 301, 317; § 2035(d)(1).[19]

It is safe to say that, with the possible exception of gifts *causa mortis*, the present transfer tax scheme eschews subjective intent determinations in favor of the objective requirements set forth in the statutes. Therefore, section 2036(a) permits the *conclusion* that a split-interest transfer was testamentary when, and if, the objective requirement that the transfer be for an

---

[19] Under section 2035(d), however, the three-year rule of section 2035(a) continues to apply to a transfer of an interest included in the gross estate under sections 2036-2038, the sections that address transfers with retained interests, those taking effect at death, and revocable transfers. Accordingly, a transfer within three years of death of a retained life estate, as in *Allen*, would be subject to the three-year inclusion rule under the current formulation *provided the transfer constituted a gift and was not a bona fide sale for an adequate and full consideration*. *See* note 12, *supra*. Section 2035(c) includes in the gross estate the amount of any gift tax paid by decedent (or his estate) on any gift by decedent (or his spouse) after 1976 and during the three years before the decedent's death. Melton's 1984 deed was not a taxable gift because it was for an adequate and full consideration as determined by the applicable tables under the regulations, as the government concedes (nor was it within three years of his death).

adequate and full consideration is not met.  Section 2036(a) does not, however, permit a perceived testamentary intent, *ipse dixit*, to determine what amount constitutes an adequate and full consideration.  Unless and until the Congress declares that intrafamily transfers are to be treated differently, *see* I.R.C. §§ 2701-2704 (West Supp. 1996) discussed below, we must rely on the objective criteria set forth in the statute and Treasury Regulations to determine whether a sale comes within the ambit of the exception to section 2036(a).  The identity of the transferee or the perceived testamentary intent of the transferor, provided all amounts transferred are identical, cannot result in transfer tax liability in one case and a tax free transfer in another.[20]

F.  Former Section 2036(c) and Chapter 14

The final obstacle preventing our acceptance of the government's construction of section 2036(a) is Congress' enactment of section 2036(c) in 1987 and its retroactive repeal and enactment of chapter 14 in 1990.  Although we are not faced with the need to determine the applicability of the 1990 estate freeze provisions to

---

[20]     Some commentators embrace portions of the government's position regarding testamentary intent and section 2036(a) by concluding that the nonadversarial aspect of intrafamily transfers taints them as necessarily donative. *See, e.g.*, Jordan, *Sales of Remainder Interests*, at 717 ("While it may be the case that the consideration received in a non-arm's length transfer is sufficient to prevent depletion of the taxpayer's gross estate, the donative character of the transaction combined with the taxpayer's retention of an interest in the property is nevertheless sufficient to make the transfer testamentary in nature.").  We believe, however, that such a view is a misconstruction of 2036(a).  The safeguards concerning sham transfers and sham consideration, combined with congressional prerogative to eliminate perceived abuses, *see* I.R.C. §§ 2701-2704, counsel against reading back into the statute what was removed statutorily in 1976.

the facts of this case,[21] we find that the abuses of the type which the government perceives in the challenged transaction were addressed by Congress when it passed section former 2036(c) in 1987 and, subsequently in 1990, when it chose to replace former section 2036(c) with the special valuation rules of chapter 14.

Congress enacted former section 2036(c) in 1987 to address certain estate "freezing techniques"[22] enabling taxpayers to take advantage of the assumptions underlying the valuation tables in the Treasury Regulations.  Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, 101 Stat. 1330-1431; *see also* Mitchell M. Gans, *GRIT's, GRAT's and GRUT's:  Planning and Policy*, 11 Va. Tax Rev. 761, 791 & n.63 (1992).  Under the terms of former section 2036(c), the "exception contained in subsection [2036](a) for a bona fide sale shall not apply to a transfer described in paragraph

---

[21]     These provisions are (with minor, irrelevant exceptions) inapplicable to transfers made on or before October 8, 1990.  P.L. 101-508, sec. 11602(e), 104 Stat. 1388-500.

[22]

> "An 'estate freeze' is a technique that has the effect of limiting the value of property held by an older generation at its current value and passing any appreciation in the property to a younger generation. Generally, the older generation retains income from, or control over, the property.
> To effect a freeze, the older generation transfers an interest in the property that is likely to appreciate while retaining an interest in the property that is less likely to appreciate.  Because the value of the transferred interest increases while the value of the retained interest remains relatively constant, the older generation has 'frozen' the value of the property in its estate."  5 Bittker & Lokken, *supra,* at 136-2 (quoting Staff of Joint Comm. on Tax'n, 101st Cong., 2d Sess., Federal Tax Consequences of Estate Freezes at 9 (Comm. Print 1990)).

(1) if such transfer is to a member of the transferor's family." I.R.C. § 2036(c)(2) (West 1989), *repealed by* P.L. 101-508, sec. 11601, 104 Stat. 1388 (1990). *See also id.* at § 2036(c)(3)(B) (defining "family" to include a "relationship by legal adoption").[23] A paragraph (1) transfer involved a transfer by the holder of a "substantial interest in an enterprise" while retaining an interest in the income or rights of the transferred enterprise. Former § 2036(c)(1)(A)-(B). Although "enterprise" as used in the legislative history and the subsequent interpretation offered by the IRS was capable of a more restrictive application, the reach of former section 2036(c) could have "potentially embrace[d] almost any activity relating to property held for personal use as well as business or investment property." Karen C. Burke, *Valuation Freezes after the 1988 Act: The Impact of Section 2036(c) on Closely Held Businesses*, 31 Wm. & Mary L. Rev. 67, 91 (1989) (citing H.R. Conf. Rep. No. 495, 100th Cong., 1st Sess. 996, *reprinted in* 1987 U.S.C.C.A.N. 2313-1245, 2313-1742; I.R.S. Notice 89-99, 1989-38 I.R.B. 4); Bruce Bettigole, *Use of Estate Freeze Severely Restricted by Revenue Act of '87*, 68 J. Tax'n 132, 133 (1988) ("Read literally, this provision would destroy the effectiveness of sales of remainder interests. . . . [B]ecause of the client's retained interest in the 'enterprise' (*i.e.*, property), upon his death the full fair market value of the

---

[23]     Paragraph (1) of former section 2036(c) applied only to "transfers after December 17, 1987." *Id*. § 2306(c)(1)(B). The 1990 repeal of former section 2036(c) was applicable to "property transferred after December 17, 1987." P.L. 101-508, sec. 11601(c), 104 Stat. 1388-491.

remainder interest will be included in his gross estate.").

In response to severe criticism of former section 2036(c) passed in 1987, Congress enacted the Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, 104 Stat. 1388, which repealed former section 2036(c) retroactively and replaced it with the valuation rules set forth in I.R.C. sections 2701-2704. *See* 5 Bittker & Lokken, *supra,* 136-3 to 136-4. Under section 2702, transfers of interests in trust to a member of the transferor's family trigger special valuation rules.[24] The general rule of section 2702 values the remainder interest transferred as having the value of the full fee interest by setting the value of the retained interest at zero. I.R.C. § 2702(a)(2). In other words, the general rule of section 2702 seems to accomplish, explicitly, precisely what the government argues that 2036(a) accomplishes by implication.[25] Because there are overwhelming indications that the

---

[24]    As the government's brief observed, a transfer of an interest in property is apparently treated as a transfer in trust if there is a term interest in the property. I.R.C. § 2702(c)(1). "Term interest" is defined as either a life interest or a term of years. *Id.* § 2702(c)(3).

[25]    We again emphasize that we take no position as to how section 2702 would affect this particular transaction had it been entered into after October 8, 1990 (transfers prior thereto being excluded from section 2702; *see* note 21, *supra*). Although the special valuation rules do not apply where the holder of a life or term interest uses the property as his personal residence, I.R.C. § 2702(a)(3)(A)(ii), the Treasury Regulations provide that the personal residence exception applies only where the residence is placed in an irrevocable trust, 26 C.F.R. § 25.2702-5(b) (1996) ("A [personal residence] trust does not meet the requirements of this section if . . . the residence may be sold or otherwise transferred by the trust or may be used for a purpose other than as a personal residence of the term holder."). Congress continues to tinker with the transfer tax scheme. A new clause added to section 2702 on August 20, 1996, strengthens the force of this Treasury Regulation.

estate freeze provisions adopted by Congress in 1990 were designed to address the perceived shortcomings of section 2036(a), we find unconvincing the government's suggestion on brief that "there is nothing in [section] 2702 or its legislative history indicating that a transfer with a retained life estate, even if within [section] 2702, was not already subject to the provisions of [section] 2036(a)."

Accordingly, we hold that the sale of a remainder interest for its actuarial value as calculated by the appropriate factor set forth in the Treasury Regulations constitutes an adequate and full consideration under section 2036(a).

## III.

As the government stipulated that the sale of the remainder interest to Melton's ranch was for its full actuarial value, the only remaining issue is whether the sale of the remainder interest was, in fact, a bona fide sale or was instead a disguised gift or a sham transaction.

The magistrate judge determined on summary judgment that sale of the Melton ranch remainder interest was not bona fide. The magistrate judge cited the following factors as pertinent to his recommendation: (1) John and David did not pay cash for the remainder interest and were not capable of paying cash at the time of the sale because of their relatively low annual salaries; (2)

---

*See* Small Business Job Protection Act of 1996, Pub. L. No. 104-188, 110 Stat. 1755 (adding I.R.C. § 2702(a)(3)(A)(iii) ("to the extent that regulations provide that such transfer is not inconsistent with the purposes of this section")).

42

John and David began receiving substantial annual bonuses in 1986 and they used large portions of the bonuses to pay down the note; (3) there were no negotiations regarding the purchase price of the transaction; and (4) Melton forgave portions of the debt evidenced by the note prior to its assignment to The Melton Company. These factors led the magistrate judge to conclude that the sale of the Melton ranch remainder interest amounted to an attempt to color a transaction that would otherwise be subject to section 2036(a)'s inclusion rule. *See Estate of Maxwell v. Commissioner*, 3 F.3d 591, 594 (2d Cir. 1993) (holding that, where children of the decedent "bought" her personal residence and leased it back to her for approximately the amount due under the note the children had executed in her favor, the lease-back was merely an attempt to "color" the transfer). We find the stipulated facts and the structure of the transaction lead to a contrary conclusion.

First, the fact that John and David were not able, at the time of the transfer of the remainder interest, to then pay the full purchase price in cash provides little, if any, guidance on the legitimacy of the transaction. It is not unusual for purchasers of real property, whether purchasing a remainder interest or a full fee, to lack the financial wherewithal to complete the transaction without incurring a debt obligation. Although it is conceivable that the very issuance of such a debt instrument can make the transfer donative (for example, if the obligors received a severely discounted interest rate or presented the kind of credit risk that would not justify the debt without a significantly higher yield on

43

the note), the government did not challenge the terms of the note or, for that matter, the creditworthiness of John and David. The "Real Estate Lien Note" executed by John and David provided, initially, for annual principal payments of $10,000 at an annual interest rate of seven percent.[26] The interest rate on matured, unpaid amounts was set at eighteen percent. The note contained acceleration provisions and provided for attorney's fees in the event of a default. Each maker had personal liability for the full amount. Finally, the note was fully secured and assignable. Aside from the identity of the parties, no factor evinces a donative transfer.

The government contends that, without the substantial bonuses received by John and David beginning in 1986, their base salaries would not have enabled them to repay the debt evidenced by the note. Bonuses are a way of life in corporate America and the fact that bonuses are used to compensate the employee-shareholders of a close corporation should come as no surprise to the IRS. *See* F. Hodge O'Neal & Robert B. Thompson, *O'Neal's Close Corporations* §§ 8.22-8.27 (3d ed. 1994 & Supp. 1996) (discussing the various forms of bonus compensation plans used by close corporations and, *inter alia*, their tax ramifications). The determinative issue regarding the payment of the bonuses to John and David is not, as the government would have us believe, whether the bonuses enabled the sons to pay the debt evidenced by the note, but rather whether the

---

[26] The parties soon thereafter agreed to monthly payments without otherwise altering the terms of the note.

bonuses were tied to the note's repayment.  The receipt of bonuses *simpliciter*, even in a close corporation held by members of the same family, does not transform compensation into a donative transfer scheme.  Rather, bonuses serve many legitimate business purposes, from recognizing a manager's ability to rewarding an employee proportionately for the success of the company.  That a particular company should choose to compensate their employees chiefly through a system of cash bonuses——as opposed to straight salary, options or warrants, commission, or on a per transaction basis——does not control our analysis.  The magistrate judge, although recognizing that "payment on the note was not a precondition to receipt of the bonuses," nevertheless found telling the fact that "the note could not have been retired without the bonuses."  His first finding negated the relevance of his second.

John and Michael received bonuses in addition to their salaries in the following amounts:

| Year | John | Michael |
|------|------|---------|
| 1986 | $ 50,000 | $ 55,000 |
| 1987 | $250,000 | $250,000 |
| 1988 | $125,000 | $125,000 |
| 1989 | $200,000 | $200,000 |
| 1990 | $ 45,000 | $ 45,000 |
| 1991 | $150,000 | $150,000 |

It is undisputed that John and Michael paid income tax on all bonus amounts.  The bonuses continued, in fact *increased*, long after the note was paid off in full in January 1988.  There are no indications that the ability of John and Michael to use the bonuses was in any way restricted by Melton or The Melton Company.  John

45

and Michael's decision to pay down the principal of the note and to forgo the use of the after-tax amount of their bonuses in alternative investments may well indicate the economic substance of the remainder interest sale. Their decision reflected an economic decision that buying the remainder interest offered a return that might outweigh the loss of the earning power of the purchase price. On the other side of the transaction, Melton's decision to sell his remainder interest reflected a decision that the debt instrument could improve his own financial status.[27]

Nor do we find compelling the absence of negotiations over the purchase price of the remainder interest. The IRS can hardly set forth actuarial valuation tables carrying the imprimatur of the government, issue revenue rulings on their proper use, and advise taxpayers through private letter rulings that the tables should be used in remainder interest sales and then protest when disinterested commercial parties—let alone family members—refuse to bicker over the purchase price when the fair market value of the fee has been properly determined, the measuring life meets the rules governing the tables' use, and the price calculated meets the economic desires of the participants.

The final factor cited by the magistrate judge is the fact that Melton made gifts of $10,000 to both John and Michael in December 1986 and made gifts and sales of stock during, and after, the course of the indebtedness. From the outset, we agree with the

---

[27] Melton, in fact, assigned the note in December 1986 in partial payment of a $231,444 debt he owed The Melton Company.

46

Melton estate that there is no testamentary synergy that arises from a taxpayer's decision to utilize fully the annual gift exclusion and other tax-saving techniques sanctioned by Congress, even where the taxpayer is of advancing years.[28]  To the extent that a taxpayer exceeds the amount provided by Congress, the gift tax adequately compensates the government for any amounts that leave the estate.[29]  Moreover, there is no indication that the gifts of stock were used by John and Michael to pay off the note; the bonuses used were compensation, not dividends.

Finally, the government argues, and the magistrate judge below held, that even though each particular transaction may survive scrutiny, "viewed as a whole" the entire series of transactions between Melton and his sons was patently testamentary.  For us to find the remainder interest sale qualifies under section 2036(a)'s bona fide sale exception, it is urged, would elevate form over substance.

We have no doubt that cases have arisen—and will continue to arise—where a clever estate planner frustrates the purpose of the estate tax while meeting the precise requirements of the statute.  But, assuming Congress has not already addressed the situation presented here by enacting chapter 14, we do not think that this

---

[28]   Unless, of course, Congress provides otherwise.  *See, e.g.*, I.R.C. § 2035(a) & (d)(2) (West 1989); I.R.C. §§ 2701-2704 (West Supp. 1996).

[29]   And, where taxable gifts are made within three years of death, the amount of gift tax paid thereon is also added to the gross estate under section 2035(c).

case is one of the rare few that come under that category.[30]  Here the sons parted with real money in the form of a fully secured, conventional real estate lien note on which each had entire personal liability; the purchase price of the remainder interest was the uncontested fair market value of the ranch discounted by the actuarial factor set forth in the government's own regulations; Melton received not only the principal amount due under the note, but also interest income generated by the note prior to its assignment to The Melton Company; no payments were missed, the note was never in danger of default, and it was *in fact* paid off in full, principal and interest, by January 1988, more than three years before Melton's death; although there were no negotiations

---

[30]  *Estate of Shafer v. Commissioner*, 80 T.C. 1145 (1983), *aff'd*, 749 F.2d 1216 (6th Cir. 1984), is more appropriately seen as the type of transaction in which the decedent, in an intrafamily transfer, attempted a form-over-substance maneuver. In *Shafer*, the decedent "had the grantors execute the deed so as to convey a remainder interest to [the children] as tenants in common while retaining a life estate for himself." *Shafer*, 749 F.2d at 1221. Accordingly, the decedent's estate argued that there was no "transfer" by the decedent to his children triggering section 2036(a). *Id.*  The Tax Court held that, because the decedent furnished the entire consideration for the property which was subsequently "unbundled" by the seller to accommodate the children's remainder interest, the decedent should be charged with making a "transfer" with a "retained" life estate, regardless of the property law niceties. *Shafer*, 80 T.C. at 1162-63.  The Sixth Circuit affirmed, observing that "the inclusion or circumvention of the intermediate step should not make a difference in the estate tax consequences of the transaction." *Shafer*, 749 F.2d at 1221; *see also Gordon v. Commissioner*, 85 T.C. 309, 324-25 (1985) (stating that, "[i]n the context of a simultaneous, joint acquisition from a third party . . . formally separate steps in an integrated and interdependent series that is focused on a particular end result will not be afforded independent significance in situations in which an isolated examination of the steps will not lead to a determination reflecting the actual overall result of the series of steps.").

concerning the purchase price, it is patent that, at the time of the transfer, a third party would have been ill-advised to pay more than its actuarial value; the bonuses were compensatory, were increased and continued long after the debt was wholly retired, and were not linked to repayment of the note; and, finally, the government, although maintaining that the sale of the remainder interest was made "in contemplation of death," concedes that Melton's death was not imminent at the time of the sale.[31] This was a bona fide sale.

## Conclusion

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for entry of judgment in favor of the Melton Estate reflecting its entitlement to a refund of all federal estate taxes paid on the basis of the inclusion of the ranch in Melton's gross estate, plus interest.

REVERSED and REMANDED with directions

---

[31] Nor was there any evidence that his death was imminent at any time while the note was outstanding.