United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 15, 2005**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 8, 2005

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-60992

_____

ALBERT STRANGI, Deceased,
Rosalie Gulig, Independent Executrix,

Petitioner - Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee.

_____

Appeal from a Decision of the United States Tax Court

_____

Before REAVLEY, JOLLY, and PRADO, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This case, which comes before us now for a second time, involves an assessment by the Commissioner of Internal Revenue of an estate tax deficiency against the Estate of Albert Strangi. Initially, the Tax Court held for the Estate. However, we remanded to the Tax Court, which reversed its prior holding and decided the case under I.R.C. § 2036(a). Section 2036(a) provides that transferred assets of which the decedent retained de facto possession or control prior to death are included in the taxable estate. The Tax Court held that Strangi retained enjoyment of the assets in question, and thus, that the transferred assets were

properly included in the estate. The Estate now appeals that decision. We find no reversible error, and accordingly AFFIRM.

I

As failing health began to telegraph that the inevitable would occur, Albert Strangi transferred approximately ten million dollars worth of personal assets into a family limited partnership. Upon his death, Strangi's Estate filed an estate tax return based on the value of his interest in that partnership, as opposed to the actual value of the transferred assets. The Internal Revenue Service issued a notice of a deficiency of $2,545,826 in estate taxes. Strangi's Estate petitioned the Tax Court for a redetermination of the deficiency.

After protracted litigation, the Tax Court found that Strangi had retained an interest in the transferred assets such that they were properly included in the taxable estate under I.R.C. § 2036(a), and entered an order sustaining the deficiency. Our review of the Tax Court's decision requires an inquiry into the structure of the limited partnership established by Strangi and the extent to which he retained enjoyment of partnership assets. First, however, some account of antecedents is in order.

A

Albert Strangi died on October 14, 1994 in Waco, Texas. He was survived by four children from his first marriage: Jeanne, Rosalie, Albert Jr., and John (collectively, the "Strangi

2

children"). Rosalie was married to Michael J. Gulig, a local attorney.

In 1965, after divorcing his first wife, Strangi married Delores Seymour. Seymour had two daughters, Angela and Lynda, from a prior marriage (collectively, the "Seymour children"). In 1987, Strangi and Seymour both executed wills, naming one another as primary beneficiaries and the Strangi and Seymour children as residual beneficiaries. That same year, Seymour began to suffer from a series of medical problems. As a result, Strangi and Seymour decided to move their residence from Florida to Waco, Texas. To facilitate the relocation, Strangi executed a general power of attorney naming Gulig as his attorney-in-fact.

In July 1990, Strangi executed a new will, naming the Strangi children as sole beneficiaries if Seymour predeceased him –- i.e., cutting out the Seymour children. The new will designated Strangi's daughter Rosalie and a bank, Ameritrust, as co-executors of the Estate. Seymour died in December 1990.

In 1993, Strangi began to experience health problems. He had surgery to remove a cancerous mass from his back, was diagnosed with a neurological disorder called supranuclear palsy, and had prostate surgery. At this point, Gulig took over management of Strangi's daily affairs.

Gulig testified that, on several occasions between 1990 and 1993, he discussed his concerns regarding Strangi's Estate with retired Texas probate Judge David Jackson, who was a personal

3

friend. Gulig said that he felt "confident" that the Seymour children would either sue Strangi's Estate or contest the will. He also claimed to have been concerned about "horrendous executor fees" that he believed Ameritrust would charge. Further, Gulig said he worried about the possibility of a tort claim by Strangi's housekeeper for injuries she sustained in an accident while caring for Strangi. He testified that Judge Jackson advised him that his fears were "very valid" and that he "had to do something" to protect the Strangi Estate.

B

On August 11, 1994, Gulig attended a seminar provided by Fortress Financial Group, Inc., explaining the so-called "Fortress Plan". The Fortress Plan was billed as a means of using limited partnerships as a tool for (1) asset preservation, (2) estate planning, (3) income tax planning, and (4) charitable giving. Fortress marketed the plan as a means of, among other things, "lower[ing] the taxable value of your estate" by means of "well established court doctrines which recognize that the value of a limited partnership interest is worth less than the value of the assets owned by the limited partnership". In brief, the plan instructed parties to "sell" their assets in exchange for an interest in a newly-created limited partnership. Because a partnership interest is worth less for tax purposes than a proportional share of the partnership's assets -- due to lack of

4

direct control and non-liquidity -- this "exchange" would reduce the taxable value of the estate.

The next day, Gulig, acting under power of attorney on behalf of Strangi: (1) prepared the Agreement of Limited Partnership of the Strangi Family Limited Partnership ("SFLP"); (2) prepared and filed the Articles of Incorporation of Stranco, Inc. ("Stranco"); (3) transferred 98% of Strangi's assets[1] -- valued at $9,932,967 -- to SFLP in exchange for a 99% limited partner interest; (4) transferred $49,350 of Strangi's assets to Stranco in exchange for 47% of Stranco's common stock; (5) facilitated the purchase of the remaining 53% of Stranco's common stock by the four Strangi children for $55,650; (6) issued a check from Stranco for a 1% general partner interest in SFLP.

The result of Gulig's efforts was a three-tiered entity, with SFLP -- and the roughly $10 million in assets Strangi had transferred into it -- at the top. The SFLP partnership agreement provided that Stranco, which owned a 1% general partnership interest in SFLP, had sole authority to conduct SFLP's business affairs. Strangi owned a 99% interest in SFLP, but was a limited partner, and thus had no formal control.

---

[1] The assets that Strangi transferred to SFLP included, inter alia, (1) brokerage accounts at Smith Barney and Merrill-Lynch valued at $7.4 million; (2) an annuity valued at $276,000; (3) two life insurance policies valued at a total of $70,000; (4) two houses in Waco; (5) a condominium in Dallas; (6) a commercial warehouse in Dallas; and (7) several limited partnership interests, valued at approximately $400,000.

Stranco itself was a Texas corporation. Strangi owned 47% of Stranco's common stock; each of his four children owned a 13% share. Stranco's articles of incorporation named Strangi and the four Strangi children as the initial board of directors. On August 17, the five met to execute the corporate bylaws, a shareholder agreement, and an authorization to employ Gulig as manager of Stranco.

On August 18, Stranco made a corporate gift of 100 shares -- a 1/4 of one percent stake -- to the McLennan Community College Foundation. Gulig later testified that he understood that the gift would improve the asset protection features of the Stranco/SFLP structure. The implementation of the "Fortress Plan" was thus completed.

Following Strangi's death in October 1994, Gulig asked Texas Commerce Bank ("TCB", a successor in interest to Ameritrust) to decline to serve as executor of the Estate. To that end, Gulig claims to have issued a "threat that no distributions would be made from SFLP to pay executor fees". After receiving indemnification from the Strangi children, TCB agreed. Strangi's will was admitted to probate in April 1995 with Rosalie Gulig as the sole executor.

C

Both prior to and after Strangi's death, SFLP made various outlays, both monetary and in-kind, to meet his needs and expenses. In September and October of 1994, SFLP distributed $8,000 and $6,000, respectively, to Strangi. On both occasions, SFLP made

6

proportional distributions –– $80.81 and $60.61, to be precise –– to its general partner, Stranco. The Commissioner suggests that these payments to Strangi were necessary because, after the transfer to SFLP, Strangi retained possession of only minimal liquid assets –– i.e., two bank accounts with funds totaling $762. The Estate responds by noting that Strangi received a monthly pension of $1,438 and Social Security payments of $1,559, and that he retained over $187,000 in "liquefiable" assets, which consisted largely of various brokerage accounts.

SFLP also distributed approximately $40,000 in 1994 to pay for funeral expenses, estate administration expenses, and various personal debts that Strangi had incurred. In 1995 and 1996, SFLP distributed approximately $65,000 to pay for Estate expenses and a specific bequest made by Strangi. Moreover, in 1995, SFLP distributed $3,187,800 to the Estate to pay federal and state inheritance taxes. The Estate notes that all of these disbursements were recorded on SFLP's books and accompanied by pro rata distributions to Stranco. The Estate further notes that it repaid SFLP for the $65,000 "advance" in January 1997.

In addition, prior to his death, Strangi continued to dwell in one of the two houses he had transferred to SFLP. The Estate notes that SFLP charged rent for the two months that Strangi remained in the house. Although the accrued rent was recorded in SFLP's books, it was not actually paid until January 1997, more than two years after Strangi's death.

7

In December 1998, the Internal Revenue Service issued a notice of deficiency to the Estate, asserting that it owed $2,545,826 in federal estate tax or, in the alternative, $1,629,947 in federal gift tax. The deficiency was attributable to the IRS's determination that Strangi's interest in SFLP was $10,947,343 -- i.e., the actual value of the assets transferred -- rather than the $6,560,730 that the Estate reported.[2]

The Estate petitioned the Tax Court for a redetermination of the deficiencies. In the Tax Court, the Commissioner of Internal Revenue contended, inter alia, that (1) SFLP should be disregarded because it lacked economic substance and business purpose; (2) the partnership agreement was a restriction on the sale or use of the underlying property that should be disregarded for valuation purposes; (3) the fair market value of Strangi's partnership interest was understated; and (4) if a discount was appropriate, Strangi had made a taxable gift on formation of SFLP to the extent the value of the property transferred exceeded the value of his partnership interest.

---

[2] The basis for the discrepancy in this case -- and the primary rationale for the use of family limited partnerships generally -- is the IRS's practice of permitting discounts in the taxable value of an estate based on a lack of marketability or control of estate property. See 26 C.F.R. § 20.2031-1(b) ("The value of every item of property includible in a decedent's gross estate ... is its fair market value at the time of the decedent's death ...").

Prior to trial, the Commissioner filed a motion for leave to amend his answer to include the alternative theory that, under I.R.C. § 2036(a), Strangi's taxable estate should include the full value of the assets he transferred to SFLP and Stranco. The Tax Court denied the motion. After a two-day trial, the court held for the Estate, rejecting all of the Commissioner's proffered reasons for inclusion of the assets. See Estate of Strangi v. Commissioner, 115 T.C. 478 (2000) ("Strangi I").

The Commissioner appealed, inter alia, the denial of the motion to amend his answer. This court affirmed in part and reversed in part, and remanded the case to the Tax Court with instructions that it either "set forth its reasons for ... denial of the Commissioner's motion for leave to amend" or "reverse its denial of the Commissioner's motion, permit the amendment, and consider the Commissioner's claim under § 2036". Estate of Strangi v. Commissioner, 293 F.3d 279, 282 (5th Cir. 2002).

On remand, the Tax Court opted to permit the amendment. The parties submitted additional briefs on the § 2036(a) issue and the Tax Court entered its opinion in May 2003, finding in favor of the Commissioner, and upholding the initially-assessed estate tax deficiency. See Estate of Strangi v. Commissioner, T.C. Memo 2003-145 (2003) ("Strangi II"). The Estate now appeals the decision of the Tax Court.

II

9

The Strangi Estate advances two primary arguments. Both hinge on the application of I.R.C. § 2036(a) to the facts at hand. Section 2036(a) provides:

> The value of the gross estate shall include the value of all property to the extent of any interest therein which the decedent has at any time made a transfer (except in the case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death
>
> (1)  the possession or enjoyment of, or the right to the income from, the property, or
>
> (2)  the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

First, the Estate contends that the Tax Court erred in holding that Strangi retained "possession or enjoyment" of the property he transferred to SFLP or the right to designate who would possess or enjoy it. If Strangi did not retain such an interest, § 2036(a) does not apply. Second, the Estate contends that, even if Strangi retained possession or enjoyment of the assets, the Tax Court erred in holding that the transfer did not fall within the "bona fide sale" exception to § 2036(a).

A

10

The core of the Estate's argument on appeal is that the Tax Court erred in concluding that Strangi retained possession or enjoyment of the assets he transferred to SFLP. It follows, the Estate contends, that the Tax Court erred in holding that the assets were includible in the taxable estate under § 2036(a).

Section 2036(a) is one of several provisions of the Internal Revenue Code intended to prevent parties from avoiding the estate tax by means of testamentary substitutes that permit a transferor to retain lifetime enjoyment of purportedly transferred property. See Estate of Lumpkin v. Commissioner, 474 F.2d 1092, 1097 (5th Cir. 1973). Specifically, § 2036(a) provides that property transferred by a decedent will be included in the taxable estate if, after the transfer, the decedent retains either (1) "possession or enjoyment" of the transferred property; or (2) "the right ... to designate the persons who shall possess or enjoy the property or the income therefrom".

A transferor retains "possession or enjoyment" of property, within the meaning of § 2036(a)(1), if he retains a "substantial present economic benefit" from the property, as opposed to "a speculative contingent benefit which may or may not be realized". United States v. Byrum, 408 U.S. 125, 145, 150 (1972). IRS regulations further require that there be an "express or implied" agreement "at the time of the transfer" that the transferor will

11

retain possession or enjoyment of the property. 26 C.F.R. § 20.2036-1(a).

In the case at bar, the benefits retained by Strangi -- including, for example, periodic payments made prior to Strangi's death, the continued use of the transferred house, and the post-death payment of various debts and expenses -- were clearly "substantial" and "present", as opposed to "speculative" or "contingent".[3] As such, our inquiry under § 2036(a)(1) turns solely on whether there was an express or implied agreement that Strangi would retain de facto control and/or enjoyment of the transferred assets.

The Commissioner does not suggest that any express agreement existed. Thus, the precise question before us is whether the record supports the Tax Court's conclusion that Strangi and the other shareholders of Stranco -- that is, the Strangi children -- had an implicit agreement by which Strangi would retain the enjoyment of his property after the transfer to SFLP.[4]

---

[3] See Byrum, 408 U.S. at 146-47 (A substantial present interest exists in "situations in which the owner of property divested himself of title but retained an income interest or, in the case of real property, the lifetime use of the property".).

[4] As the Tax Court explained, § 2036(a) includes within the taxable estate any asset that is not transferred "absolutely, unequivocally, irrevocably, and without possible reservations". Strangi II, T.C. Memo 2003-145 (quoting Commissioner v. Estate of Church, 335 U.S. 632, 645 (1945)). The controlling question for present purposes, then, is not whether Strangi actually kept any particular asset in his possession, but whether he received a general assurance that his assets would be available to meet his personal needs.

12

The Tax Court's determination that an implied agreement existed is a finding of fact and is reviewed only for clear error. See Maxwell v. Commissioner, 3 F.3d 591, 594 (5th Cir. 1993). A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole. See, e.g., United States v. Villanueva, 408 F.3d 193, 203 (5th Cir. 2005). As such, we will disturb the Tax Court's findings of fact only if we are "left with the definite and firm conviction that a mistake has been made". Otto Candies, L.L.C. v. Nippon Kaiji Kyokai Corp., 346 F.3d 530, 533 (5th Cir. 2003) (quoting Allison v. Roberts (In re Allison), 960 F.2d 481, 483 (5th Cir. 1992)).

The Tax Court, in its memorandum opinion, presented a litany of circumstantial evidence to support its conclusion. The Estate responds that each of the factors cited by the court is either factually erroneous or irrelevant. We consider each of the evidentiary factors in turn.

First, the Commissioner cites SFLP's various disbursements of funds to Strangi or his Estate. The Estate responds that only two of the payments -- those made in September and October 1994, totaling $14,000 -- should be considered, because the remaining payments were made after Strangi's death, and thus "were not as a consequence of anything Mr. Strangi did".

The Estate's response misses the point. Certainly, part of the "possession or enjoyment" of one's assets is the assurance that they will be available to pay various debts and expenses upon one's

13

death.[5]  And that assurance is precisely what Strangi retained in this case.  SFLP distributed over $100,000 from 1994 to 1996 to pay for funeral expenses, estate administration expenses, specific bequests and various personal debts that Strangi had incurred. These repeated distributions provide strong circumstantial evidence of an understanding between Strangi and his children that "partnership" assets would be used to meet Strangi's expenses.[6]

Second, the Tax Court found "highly probative" Strangi's "continued physical possession of his residence after its transfer to SFLP".  The Estate responds by noting that SFLP charged Strangi rent on the home.  As the Tax Court observed, although the rent charge was recorded in SFLP's books in 1994, the Estate made no actual payment until 1997.  Even assuming that the belated rent payment was not a post hoc attempt to recast Strangi's use of the

_____

[5] See 26 C.F.R. § 20.2036-1 ("The 'use, possession ... or other enjoyment of the transferred property' is considered as having been retained by ... the decedent to the extent that the use, possession ... or other enjoyment is to be applied toward the discharge of a legal obligation of the decedent ... ."); see also Ray v. United States, 762 F.2d 1361, 1363 (9th Cir. 1985)(considering use of transferred assets to pay transferor's funeral expenses as supportive of finding that transferor retained possession or enjoyment under § 2036).

[6] The Estate further contends that all of the above payments were "pro rata partnership distributions", meaning that Stranco received cash disbursements in proportion to its 1% general partner interest in SFLP.  The Tax Court characterized these payments as "de minimis", insofar as they did not "in any substantial way operate to curb decedent's ability to benefit from SFLP property". Strangi II, T.C. Memo 2003-145.  In short, although the importance of the pro rata distributions to the "implied agreement" inquiry is perhaps debatable, there is nothing clearly erroneous about the decision to assign them minimal weight.

14

house, such a deferral, in itself, provides a substantial economic benefit. As such, the Tax Court did not err in considering Strangi's continued occupancy of his home as evidence of an implied agreement.

Third, both the Commissioner and the Tax Court point to Strangi's lack of liquid assets after the transfer to SFLP as evidence that some arrangement to meet his expenses must have been made. As noted supra, Strangi transferred over 98% of his wealth to SFLP and afterward retained only $762 in truly liquid assets. The Estate counters that Strangi had over $187,000 in "liquefiable" securities, which could have been sold to meet expenses for the remainder of Strangi's life -- that is, for the twelve to twenty-four months he was expected to live after August 1994. Even this limited assertion seems dubious, however, when, as the Tax Court noted, Strangi averaged nearly $17,000 in monthly expenses over the two months between the creation of SFLP and his death. See Strangi II, T.C. Memo 2003-145.

In sum, upon creation of SFLP, Strangi retained assets barely sufficient to meet his own living expenses for the low end of his life expectancy -- that is, for about one year -- assuming he was never required to pay rent, estate administration costs, outstanding personal debts, funeral expenses, or taxes. At the same time, Strangi began receiving substantial monthly payments out of SFLP's coffers. Given these circumstances, we cannot say that the Tax Court clearly erred in holding that Strangi and his

15

children had some implicit understanding by which Strangi would continue to use his assets as needed, and therefore retain "possession or enjoyment" within the meaning of § 2036(a)(1).[7]

B

The Estate next contends that, even if the assets transferred to SFLP do fall within the ambit of § 2036(a)(1), they should nonetheless be excluded from the taxable estate, based on the "bona fide sale" exception contained in § 2036(a). For the reasons set forth below, we disagree.

Section 2036(a) provides an exception for any transfer of property that is a "bona fide sale for an adequate and full consideration in money or money's worth". The exception contains two discrete requirements: (1) a "bona fide sale", and (2) "adequate and full consideration". See Estate of Harper v. Commissioner, T.C. Memo 2002-121. Both must be satisfied for the exception to apply.

1

We turn briefly to the "adequate and full consideration" requirement. This requirement is met only where any reduction in the estate's value is "joined with a transfer that augments the estate by a commensurate ... amount". Kimbell, 371 F.3d at 262.

_____

[7] Because we hold that the transferred assets were properly included in the taxable estate under § 2036(a)(1), we do not reach the Commissioner's alternative contention that Strangi retained the "right ... to designate the persons who shall possess or enjoy the property", thus triggering inclusion under § 2036(a)(2).

16

Where assets are transferred into a partnership in exchange for a proportional interest therein, the "adequate and full consideration" requirement will generally be satisfied, so long as the formalities of the partnership entity are respected.[8] The Commissioner concedes that such has been the case here. As such, the adequate and full consideration prong of the exception is satisfied and the sole question before us is whether the transfer was a "bona fide sale".

2

Thus, we turn our attention to the bona fide sale requirement. The term "bona fide", taken literally, means "in good faith" or "without fraud or deceit". See BLACK'S LAW DICTIONARY, 186 (8th ed. 2004). As we have previously observed, use of a "bona fide" standard often requires the courts to assess both the subjective intent of a party and the objective results of his actions. See,

---

[8] As we observed in Kimbell, 371 F.3d at 266:

> The proper focus therefore on whether a transfer to a partnership is for adequate and full consideration is: (1) whether the interest credited to each of the partners was proportionate to the fair market value of the assets each partner contributed to the partnership, (2) whether the assets contributed by each partner to the partnership were properly credited to the respective capital accounts of the partners, and (3) whether on termination or dissolution of the partnership the partners were entitled to distributions from the partnership in amounts equal to their respective capital accounts.

17

e.g., United States v. Adams, 174 F.3d 571, 576-77 (5th Cir. 1999).

As we noted in Wheeler v. United States, however, Congress in 1976 removed a provision from the Internal Revenue Code that included within the taxable estate transfers "intended to take effect in possession or enjoyment" after the decedent's death. 116 F.3d 749, 765 (5th Cir. 1997). We observed that Congress's apparent purpose was to "eliminate factbound determinations hinging on subjective motive". Id. (quoting Estate of Elkins v. Commissioner, 797 F.2d 481, 486 (7th Cir. 1986)). As such, since Wheeler, we have held that whether a transfer of assets is a bona fide sale under § 2036(a) is a purely objective inquiry. See Kimbell, 371 F.3d at 263-64.

We have yet to definitively state, however, precisely what this "objective" inquiry entails. Relying on language from Wheeler, the Estate contends that the "objective" bona fide sale inquiry requires only that the transfer be for adequate and full consideration.[9] The exception to § 2036(a), however, already

_____

[9] In support of its contention, the Estate cites Wheeler for the proposition that "[t]he only possible grounds for challenging the legitimacy of a transaction [under § 2036(a)] are whether the transferor actually parted with the [transferred property] and the transferee actually parted with the requisite adequate and full consideration". 116 F.3d at 764. Our holding in Wheeler, however, was expressly limited to the narrow factual circumstances of an intra-family sale of a remainder interest in real property. See id. at 756. Although adequate consideration may suffice to show the absence of fraud or deceit where a real property interest is, in fact, transferred from one party to another, such is not the case where, as here, the purported transfer arguably deprives the

18

expressly requires that transfers be for "adequate and full consideration". As such, the Estate's interpretation of the exception would render the term "bona fide" superfluous, and must therefore be rejected.[10]

We think that the proper approach was set forth in Kimbell, in which we held that a sale is bona fide if, as an objective matter, it serves a "substantial business [or] other non-tax" purpose. Id. at 267. As noted supra, Congress has foreclosed the possibility of determining the purpose of a given transaction based on findings as to the subjective motive of the transferor. Instead, the proper inquiry is whether the transfer in question was objectively likely to serve a substantial non-tax purpose.[11] Thus, the finder of fact is charged with making an objective determination as to what, if any, non-tax business purposes the transfer was reasonably likely to serve at its inception. We review such a determination only for clear error. See Walker Intern. Holdings Ltd. v. Republic of Congo, 395 F.3d 229, 233 (5th Cir. 2004).

---

transferor of literally nothing.

[10] We recognize that the Estate's proposed interpretation of § 2036(a) would yield a more uniform and predictable rule than the one set forth in Kimbell and here. Although we acknowledge the importance of predictability in the law governing estates and estate planning, it cannot be had at the expense of the plain language of the statute.

[11] Accord Merryman v. Commissioner, 873 F.2d 879, 881 (5th Cir. 1989) ("To determine whether economic substance is present, courts view the objective realities of the transaction or, in other words, whether what was actually done is what the parties to the transaction purported to do.").

19

The Estate proffered five discrete non-tax rationales for Strangi's transfer of assets to SFLP. They are: (1) deterring potential tort litigation by Strangi's former housekeeper; (2) deterring a potential will contest by the Seymour children; (3) persuading a corporate executor to decline to serve; (4) creating a joint investment vehicle for the partners; and (5) permitting centralized, active management of working interests owned by Strangi. The Tax Court rejected each of the rationales as factually implausible. In reviewing for clear error, we ask only whether the Tax Court's findings are supported by evidence in the record as a whole, not whether we would necessarily reach the same conclusions.

First, the Estate contends that Strangi transferred his assets to SFLP partly out of concern that his former housekeeper, Stone, might bring a tort claim against the Estate for injuries sustained on the job. The Tax Court, however, heard admissions by Gulig that Strangi had paid all of the medical expenses stemming from Stone's injury and had continued to pay her salary during her absence from work.

Still, the Estate contends, had Stone sued, she might have recovered a substantial amount for her pain and suffering. Although this possibility cannot be ruled out entirely, the evidence before the Tax Court suggests otherwise. Gulig testified, for example, that Stone and Strangi were "very close" and admitted that he had never inquired as to whether there was any evidence

20

that Strangi actually caused Stone's injury. Further, there is no evidence that Stone ever threatened to take any action. As such, the Tax Court did not clearly err in finding that the transfer of assets into SFLP did not operate to deter Stone from bringing a tort claim against the Estate.

Second, the Estate contends that SFLP served to deter a will contest by the Seymour children. The Tax Court concluded that "[t]he Seymour claims were stale when the partnership was formed, and they never materialized". Strangi I, 115 T.C. at 485. Further, although the Seymour children did retain counsel, Gulig admitted that prior to the creation of SFLP neither they nor their attorney ever contacted him in regard to Strangi's will, and that no claim was ever made against the Estate. Although reasonable minds might differ on this point, the Tax Court's factual conclusion -- i.e., that the Seymour children either would not or could not have mounted a successful challenge to the will -- is not clearly erroneous.

Third, the Estate argues that SFLP deterred TCB, the corporate co-executor of Strangi's will, from serving, thus saving the Estate a substantial amount in executor's fees. The Estate presented Gulig's testimony regarding a meeting with TCB and TCB's subsequent declining to serve. Nonetheless, the Tax Court was unpersuaded, noting that it was "skeptical of the estate's claims of business purposes related to executor and attorney's fees". See id.

21

The Estate concedes that "the reason for which the corporate co-executor declined to serve[] is not reflected in the record". Thus, although a finder of fact might infer a causal relationship between the existence of SFLP and TCB's withdrawal, there is nothing clearly erroneous in the Tax Court's refusal to do so.

Fourth, the Estate contends that SFLP functioned as a joint investment vehicle for its partners. The Tax Court rejected this contention, noting that the contribution of the Strangi children, which totaled $55,650, was de minimis and thus properly ignored for purposes of the bona fide sale requirement. The Tax Court further concluded that, even if the contributions of the children were properly considered, SFLP never made any investments or conducted any active business following its formation. See Strangi I, 115 T.C. at 486.

The Estate responds that ignoring a shareholder's contribution as de minimis runs contrary to Kimbell, in which we noted that there exists "no principle of partnership law that would require the minority partner to own a minimum percentage interest in the partnership for ... transfers to be bona fide". 371 F.3d at 268. It is certainly true that the de minimis contribution of a minority partner is not, in itself, sufficient grounds for finding that a transfer of assets to a partnership is not bona fide. However, where a partnership has made no actual investments, the existence of minimal minority contributions may well be insufficient to overcome an inference by the finder of fact that joint investment

22

was objectively unlikely. Such appears to have been the case here. Thus, it was not clear error for the Tax Court to reject the Estate's "joint investment" rationale.

Finally, the Estate contends that SFLP permitted active management of Strangi's "working assets". As a preliminary matter, it is undisputed that the overwhelming majority of the assets transferred to SFLP did not require active management. Some seventy percent of the transfer, for example, consisted of various brokerage accounts. As the Estate points out, however, this is not unlike the situation in Kimbell, where we reversed summary judgment for the Commissioner based in part on the transferor's contribution of $438,000 in working oil and gas properties, which comprised approximately 11% of the overall transfer. See id. at 267.

The Estate asserts that working assets -- including real property and interests in real estate partnerships -- comprise an approximately equal proportion of the transfer in this case, as in Kimbell. Assuming this to be an accurate characterization of Strangi's contribution, this analogy misses the point. In Kimbell, we reviewed cross motions for summary judgment on the "bona fide sale" issue. In reversing the district court, we noted that the Commissioner "raised no issues of material fact in its motion for summary judgment and challenged none of the taxpayer's facts". Id. at 268-69. Among the unchallenged facts was the taxpayer's assertion that there had been significant active management of the transferred oil and gas properties. Id. at 267-68.

23

By contrast, this case comes to us after a full trial on the merits. The Tax Court heard uncontested evidence that "[n]o active business was conducted by SFLP following its formation". Strangi I, 115 T.C. at 486. In short, although Strangi may have transferred a substantial percentage of assets that might have been actively managed under SFLP, the Tax Court concluded, based on substantial evidence, that no such management ever took place. From this, the Tax Court fairly inferred that active management was objectively unlikely as of the date of SFLP's creation. As such, we cannot say that the Tax Court clearly erred in rejecting the Estate's "active management" rationale.

In sum, we hold that the Tax Court did not clearly err in finding that Strangi's transfer of assets to SFLP lacked a substantial non-tax purpose. Accordingly, the "bona fide sale" exception to § 2036(a) is not triggered, and the transferred assets are properly included within the taxable estate. We therefore affirm the estate tax deficiency assessed against the Estate.

C

The Estate raises one final matter for our consideration. It contends that, even if the Tax Court did not err in holding the transferred assets includible under § 2036(a), it nonetheless abused its discretion in denying the Estate leave to amend its petition to include a computational offset, based on a time-barred income tax refund, under the doctrine of equitable recoupment. As

24

such, the Estate requests that we remand the case to the Tax Court with instructions that it offset the assessed estate tax deficiency by $304,402 already paid in income taxes.

The doctrine of equitable recoupment applies where the Commissioner brings a timely suit for payment of taxes owed and the taxpayer seeks to offset that amount by seeking a refund of an erroneously imposed tax, but the taxpayer's claim is time-barred. Equitable recoupment allows the taxpayer to raise the time barred refund claim "in order to reduce or eliminate the money owed on the [Commissioner's] timely claim". Estate of Branson v. Commissioner, 264 F.3d 904, 909 (9th Cir. 2001).

The problem in this case, as the Tax Court points out, is that the Estate has adopted two inconsistent positions with respect to its equitable recoupment argument. To sustain a claim for equitable recoupment, the taxpayer must show, inter alia, that the refund sought is, in fact, time-barred. See Estate of Branson, 264 F.3d at 910 (citing Stone v. White, 301 U.S. 532, 538 (1937)). The Estate, however, currently has a separate action pending in the Western District of Texas, in which it contends that the disputed refund is not time-barred.

Given this inconsistency, the Tax Court held that the Estate failed to show that the refund was time-barred, and denied its motion to amend. On appeal, the Estate argues only that this result is inequitable. Unfortunately, in so doing, it neglects to

address the controlling legal issue here –- i.e., whether the Tax Court erred in concluding that the refund was not time-barred, and thus not subject to equitable recoupment.  In sum, because the Estate has failed to brief us on the underlying merits of the Tax Court's ruling, it has likewise failed to show that the Tax Court abused its discretion in denying the motion to amend.

III

For the foregoing reasons, the decision of the Tax Court is

AFFIRMED.