# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 8, 2026

Lyle W. Cayce
Clerk

———————

No. 25-60403

———————

Estate of Anne Milner Fields, *Deceased*, Bryan K. Milner, Executor,

*Petitioner—Appellant*,

*versus*

Commissioner of Internal Revenue,

*Respondent—Appellee*.

———————————————————

Appeal from the Tax Court, Internal Revenue Service
Agency No. 1285-20

———————————————————

Before King, Higginson, and Duncan, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

This is a case about the proper tax treatment of Anne Milner Fields's estate (the "Estate"). As Fields's health rapidly declined, her agent and great-nephew Bryan Milner transferred $17 million of her assets into a limited partnership. After she died, the Estate filed an estate tax return valuing those assets at nearly $11 million based on the Estate's partnership interest. The Internal Revenue Service ("IRS") audited the Estate, issued a notice of deficiency for the discrepancy, and assessed a 20% penalty. The Tax Court affirmed, and the Estate appealed.

No. 25-60403

We affirm. The Estate has not shown that Fields's assets were transferred for a non-tax purpose, so the bona fide sale exception in I.R.C. § 2036(a) does not apply. Nor has the Estate shown it was not negligent or that it acted with reasonable cause and in good faith.

I

A

Fields was a businesswoman who successfully ran her husband's oil business after he died in 1963. She had a close relationship with her great-nephew, Milner. During her lifetime, she mentored Milner and funded his education in finance and business administration. Milner worked in corporate finance for his entire professional career, handling various lending and banking responsibilities at major banks.

On January 29, 2010, Fields signed a last will and testament appointing Milner as the executor of her Estate, and a power of attorney (the "POA") appointing Milner as her agent. The POA also named Milner's two sisters as first and second alternate agents.

In 2011, Fields was diagnosed with Alzheimer's disease. Her condition progressively declined over the next five years leading up to her death. She fell numerous times, broke her hip twice, and suffered recurring urinary tract infections. She was hospitalized frequently and experienced decreased appetite, weight loss, and confusion. As a result, Milner hired 24-hour caregivers and purchased a home for Fields across the street from him to ensure he could adequately care for her. By 2012, Milner was handling most of Fields's finances as her agent. And when Fields was the victim of two

instances of financial elder abuse, Milner investigated and rectified the issues.[1]

B

In 2015, Milner approached his friend and attorney John Mongogna, seeking investment advice for Fields's assets. On Mongogna's advice, Milner formed two LLCs. AMF Capital, LLC ("AMF Capital") held cash, notes receivable, and collectible guitars. Winnsboro Capital, LLC ("Winnsboro Capital") held real estate in Winnsboro, Texas. Fields was the sole member of both LLCs, but Milner signed all relevant documents on her behalf.

Starting in May 2016, Fields's health began to precipitously decline. On May 6, she fell again. Around one week later, Milner approached Mongogna again to discuss Fields's estate planning. Mongogna referred Milner to estate-planning attorney Jamie Katzen, who recommended forming a limited partnership to hold Fields's assets. On May 20, 2016, Katzen filed a certificate of formation for a limited partnership called AM Fields, LP ("AM Fields") and emailed an appraiser seeking advice on "obtaining a deeper discount."

On May 21, Fields suffered a heart attack and spine fracture and was hospitalized for several days.

Several days later, on May 25, Milner executed a partnership agreement for AM Fields. The agreement named Fields as limited partner

---

[1] In 2011, when Fields was recovering from hip surgery, Milner discovered a home-repair scam that had duped Fields out of approximately $20,000. He filed a police report. And in 2013, Milner discovered that one of Fields's caregivers was routinely requesting cash back while grocery shopping with Fields's debit card. He resolved the issue by limiting available funds in Fields's bank account and setting text alerts for debit card usage.

with 99.9941% interest, and newly formed AM Fields Management LLC ("Management") as general partner with .0059% interest. Milner is the sole member of Management. Management contributed $1,000 to AM Fields in exchange for its .0059% interest, and Fields contributed $16,972,409 in various assets for a 99.9941% interest. Milner signed all relevant documents both individually and on behalf of Fields as her agent.

Milner then transferred most of Fields's assets into AM Fields. On May 27, he transferred Fields's membership interest in AMF Capital, Fields's membership interest in Winnsboro Capital, and a tree farm that Fields owned in Texas. On June 6, he transferred 89,093 shares of stock in a local bank valued at $5.34 million.

Around this time, Fields fell again. And at a June 9 doctor's appointment, Fields's physician declared her Alzheimer's "end stage," noted her need for "total care," and recommended hospice.

Then, on June 13, Milner transferred most of Fields's Wells Fargo brokerage account (nearly $10 million) into AM Fields. These transfers left Fields with approximately $2.15 million in assets outside the partnership. At this point, AM Fields held assets valued at approximately $17 million.

On June 15, 2016, Fields was placed in hospice, and on June 23, she passed away.

C

Upon Fields's death, Milner initiated a probate action as executor of her Estate. He paid ten specific cash bequests named in Fields's will, which required a distribution of assets from AM Fields because her Estate did not have enough cash after the transfers. Milner also retained an accounting firm to prepare the Estate's tax return. Milner primarily worked with CPA Jerri Hammer to prepare the return. On the return, the Estate included in the

gross estate Fields's limited partner interest in AM Fields, which Hammer valued at $10,877,000. The Estate did not include the value of Fields's assets that were transferred into AM Fields, which was approximately $17 million at the time of her death. The estate tax liability was thus diminished by roughly $6 million. Hammer calculated the Estate's final tax liability at $4,617,800.

The IRS audited the return and, finding it suspect, issued a Notice of Deficiency to the Estate. The IRS found that under I.R.C. § 2036, the Estate should have valued the gross estate using the value of Fields's assets contributed to AM Fields, rather than the value of her partnership interest in AM Fields. The IRS assessed a 20% penalty for the underpayment.

The Estate filed a petition with the Tax Court for a redetermination of the deficiency. *See* I.R.C. § 6213(a). After hearing the parties' arguments and witness testimony, the Tax Court agreed with the IRS that the Estate had been undervalued, and a penalty should apply. The Tax Court determined an estate tax deficiency of $1,828,594 and imposed a penalty of $270,417. The Estate now appeals.[2]

## II

We review the Tax Court's findings of fact for clear error and its conclusions of law *de novo*. *Ray v. Comm'r*, 13 F.4th 467, 475 (5th Cir. 2021). The Tax Court's "characterization of a transaction for tax purposes is a question of law . . . , but the particular facts from which that characterization is made are reviewed for clear error." *Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 543 (5th Cir. 2009). "A factual

---

[2] We have jurisdiction to hear this appeal under I.R.C. § 7482(a)(1). ("The United States Courts of Appeals . . . shall have exclusive jurisdiction to review the decisions of the Tax Court . . . .").

finding is not clearly erroneous if it is plausible in light of the record read as a whole." *Strangi v. Comm'r*, 417 F.3d 468, 477 (5th Cir. 2005). Accordingly, "we will disturb the Tax Court's findings of fact only if we are 'left with the definite and firm conviction that a mistake has been made.'" *Ibid.* (quoting *Otto Candies, L.L.C. v. Nippon Kaiji Kyokai Corp.*, 346 F.3d 530, 533 (5th Cir. 2003)); *see also Ray*, 13 F.4th at 475.

### III

### A

The correct value of the Estate turns on the proper application of I.R.C. § 2036(a):

> The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent *has at any time made a transfer* (except in case of a *bona fide sale* for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—
>
> > (1) the possession or enjoyment of, or the right to the income from, the property, or
> >
> > (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

I.R.C. § 2036(a) (emphasis added). In other words, property is included in a decedent's gross estate if the following three elements are met: (1) the decedent transferred property before death; (2) the decedent retained an interest in the property that was relinquished only at death; and (3) the transfer was not a bona fide sale for adequate and full consideration. *Estate of Fields v. Comm'r*, T.C.M. (RIA) 2024-090 at 13 (2024); *see also Kimbell v.*

*United States*, 371 F.3d 257, 261 (5th Cir. 2004) (explaining Section 2036(a) "recognizes that some assets transferred prior to death must be recaptured into the estate" unless "the transfer is a bona fide sale for full and adequate consideration").

The Estate raises only one issue on appeal in relation to § 2036(a): whether the transfers of Fields's assets to AM Fields were a bona fide sale.[3] This issue is "a purely objective inquiry" requiring the finder of fact to determine whether, "as an objective matter, [the transfer] serves a 'substantial business [or] other non-tax' purpose." *Strangi*, 417 F.3d at 479 (second alteration in original) (quoting *Kimbell*, 371 F.3d at 267). The objective evidence must show a "real, actual or genuine" transfer motivated by more than just tax planning. *Kimbell*, 371 F.3d at 264.

In the context of transferring assets into limited partnerships, "[t]he objective evidence must indicate that the nontax reason was a significant factor that motivated the partnership's creation. . . . A significant purpose must be an actual motivation, not a theoretical justification." *Estate of Bongard v. Comm'r*, 124 T.C. 95, 118 (2005). Such a determination by the Tax Court is a factual finding we review for clear error. *Strangi*, 417 F.3d at 480.

B

The Estate advances three purported non-tax reasons for the transfers: (1) to remedy insufficiencies of Fields's POA as to succession and management; (2) to consolidate and streamline management of Fields's

---

[3] In the Tax Court, the parties did not dispute whether the first condition was met. *Estate of Fields*, T.C.M. (RIA) 2024-090 at 14. The Tax Court considered the second element and concluded that Fields retained an interest in and enjoyment of her property relinquished only upon her death. *Id.* at 14–16. The Estate does not dispute this conclusion on appeal. As to the third element, the Tax Court found that Fields received adequate and full consideration. *Id.* at 16–17. The Estate does not contest this finding either.

assets; and (3) to protect against fraud and elder abuse. The Estate raised the same arguments below. *See Estate of Fields*, T.C.M. (RIA) 2024-090 at 18. The Tax Court rejected each, highlighting the suspicious timing between the transfers and Fields's age and health. *Id.* at 18–21. We conclude that the Tax Court did not clearly err in finding the creation of and contributions to AM Fields did not serve a substantial non-tax purpose.

1

First, the Estate argues that the transfers served the non-tax purpose of resolving limitations of Fields's POA.

One such limitation was the inability to appoint a successor agent after Fields was incapacitated. The Estate concedes that Fields named Milner's two sisters as successor agents, but it argues that the plan of succession was unworkable because neither sister felt comfortable handling Fields's financial affairs should Milner become incapable.

The Estate's concern about succession is unfounded. Fields, an intelligent businesswoman, was of sound mind when she executed her power of attorney naming Milner's sisters as successor agents. Neither Milner nor his sisters expressed any concern at that time about their ability to handle Fields's affairs if needed. Nor did Fields. Furthermore, the creation of AM Fields would not have resolved this purported problem anyway. AM Fields's governing documents allow for management succession only with the unanimous consent of all partners—Milner individually, and Milner as Fields's agent. Thus, in the event of Milner's incapacity, there would be no way for him to name a successor.

A second purported limitation was "continuous[]" problems with financial institutions mistrusting and refusing to honor Milner's authority as Fields's agent. The creation of AM Fields, the Estate argues, "provide[d] the flexibility to bifurcate the responsibility of managing [Fields's] business

assets" and "resolved issues with a known unwillingness of Texas financial institutions to complete financial transactions expeditiously . . . when authority was claimed using an aging Power of Attorney form."

But that argument is belied by the fact that Milner was able to successfully transfer $17 million of Fields's assets into AM Fields in a span of one month using only his authority as her agent. The Tax Court emphasized the timeline of the transfers in great detail, noting that they "proceeded rapidly." *Estate of Fields*, T.C.M. (RIA) 2024-090 at 19–20. And, as the IRS correctly points out, the Estate did not present any evidence to the Tax Court showing a "continuous" problem managing Fields's affairs as her agent. [4]

Accordingly, the Tax Court did not clearly err when it rejected this argument, finding it a "post hoc 'theoretical justification'" rather than an "actual motivation." *Id.* at 21 (quoting *Estate of Bongard*, 124 T.C. at 118).

2

Next, the Estate argues that "Fields' [sic] multi-million dollar asset holdings were complex and required expert skillsets." It claims AM Fields was thus formed for the non-tax purpose of helping "consolidate and streamline management of Ms. Fields' [sic] various assets and lines of business."

It is true that Fields held numerous valuable assets. But it is also true that none of those assets were "'working' interests in any business requiring active management." *Id.* at 20; *cf. Kimbell*, 371 F.3d at 267–68 (finding transfer of assets into a partnership a bona fide sale because the "objective

---

[4] Milner recalled only one instance in which the POA was insufficient. When Milner bought a house for Fields in 2012, the title company requested proof of Fields's current incapacitation and that she was of sound mind at the time she executed the POA.

facts" established that those assets "included working interests in oil and gas properties which do require active management"). The Wells Fargo brokerage account was professionally managed by Wells Fargo and, later, by UBS. The shares of local bank stock did not require active management; in fact, most were never sold and paid Milner regular dividends. There is no evidence showing that Winnsboro Capital and AMF Capital required active management either. And the tree farm's operations had been managed by a local company for decades.

No evidence shows the assets transferred into AM Fields needed consolidation or streamlining. They were "of a disparate character, promised no obvious synergies with each other, and came almost exclusively from Ms. Fields." *Estate of Fields*, T.C.M. (RIA) 2024-090 at 20. There was, therefore, "virtually no prospect of 'intangibles stemming from a pooling [of assets] for joint enterprise.'" *Ibid.* (alteration in original) (quoting *Estate of Harper v. Comm'r*, 83 T.C.M. (CCH) 1641, 1654 (2002)). The Tax Court did not clearly err in rejecting this purported non-tax purpose.

3

Finally, the Estate claims AM Fields was created for the non-tax purpose of protecting against fraud and elder abuse. The Estate cites a "known risk of elder abuse" on "multiple occasions" but only cites two instances of elder abuse in 2011 and 2013. *See supra* at 2 & n.1. The Estate does not explain why Milner waited several years after the elder abuse occurred to create AM Fields. As the IRS argues, if fraud and elder abuse were true non-tax motivations for creating AM Fields, it is likely that Milner would have formed the partnership years earlier when the incidents occurred.

The Tax Court gave little weight to this purported non-tax justification. *Estate of Fields*, T.C.M. (RIA) 2024-090 at 20. It did not clearly err in doing so. "The instances of financial elder abuse had occurred years

before the formation of AM Fields," making it highly unlikely that protection against future elder abuse was a significant non-tax reason for the transfers. *Ibid.*

### 4

The Tax Court offered six additional reasons in support of its findings.

First, the timeline of events. After Fields fell in early May, Milner began the process of creating a partnership. By late May, AM Fields was created, and it was funded with $17 million of Fields's assets by June 13. Fields died only ten days later. *Id.* at 19. This timeline "casts significant doubt on Mr. Milner's avowal that he was actually motivated to undertake the AM Fields transactions for any reason other than reducing estate tax (by virtue of obtaining a discount on Ms. Fields's partnership interest . . . .)." *Ibid.* Second, there is no evidence that anyone discussed transferring Fields's assets into a partnership until after her health was in serious decline. *Id.* at 19–20. Third, there were no significant changes to Fields's assets leading up to the transfers that may have raised a non-tax reason to effectuate the transfers. *Id.* at 20. Fourth, Milner's estate-planning attorney sent an email to an appraiser seeking a "deeper discount." *Ibid.* Fifth, Fields was incapacitated during the creation of AM Fields and transfer of assets. Milner appeared on both sides of every transaction, representing "both her interests and his own." *Ibid.* And finally, the asset transfers depleted Fields's liquid assets such that the Estate could not pay her bequests upon her death. *Id.* at 21.

We agree with the Tax Court that these facts are "troublesome." *Ibid.* They support the Tax Court's ruling that it is far more likely that the Estate's three proposed non-tax purposes are after-the-fact justifications, not actual motivations. *Id.* at 19–21.

C

In sum, we hold that the Tax Court did not clearly err in finding that the transfer of Fields's assets to AM Fields lacked a substantial non-tax purpose. Accordingly, § 2036(a) mandates inclusion of the value of the transferred assets within the gross estate rather than the value of the partner interest.

IV

The Estate also appeals the Tax Court's assessment of a 20% accuracy-related penalty on the tax deficiency.

Section 6662 imposes a 20% tax on the underpayment of taxes due to "negligence or disregard of rules or regulations." I.R.C. § 6662(a), (b)(1). "Negligence is strongly indicated when a taxpayer fails to ascertain the correctness of an exclusion or deduction that would seem to a reasonable person to be 'too good to be true.'" *Sun v. Comm'r*, 880 F.3d 173, 181 (5th Cir. 2018) (quoting 26 C.F.R. § 1.6662-3(b)(1)). But no penalty applies if the taxpayer can show "reasonable cause" and "act[ing] in good faith." I.R.C. § 6664(c). A taxpayer's reliance on the advice of a tax professional may demonstrate reasonable cause and good faith, but not necessarily. *Klamath*, 568 F.3d at 548; 26 C.F.R. § 1.6664-4(b). Instead, "the validity of this reliance turns on 'the quality and objectivity of the professional advice which they obtained.'" *Klamath*, 568 F.3d at 548 (quoting *Swayze v. United States*, 785 F.2d 715, 719 (9th Cir. 1986)). Ultimately, the "most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." 26 C.F.R. § 1.6664-4(b).

The Tax Court found that the Estate lacked reasonable cause for its underpayment because a $6 million reduction of reportable assets (from a $17 million asset valuation to an $11 million partnership interest valuation) should have struck "a reasonable person in Mr. Milner's position as very

possibly too good to be true." *Estate of Fields*, T.C.M. (RIA) 2024-090 at 24–25. The Tax Court also found the Estate did not establish its defense that it relied in good faith on a tax professional's advice. *Id.* at 25. The Estate did not provide evidence that Hammer, the accountant, advised it to report Fields's AM Fields interests "at a discount." *Ibid.* Nor did the Estate present evidence that anyone advised Milner that the "Estate's treatment of AM Fields on its estate tax return was proper." *Ibid.*

The Tax Court's "determinations regarding the taxpayer's eligibility for a reasonable cause and good faith defense are factual findings" that we review for clear error. *Ray*, 13 F.4th at 482–83 (citing *Sun*, 880 F.3d at 181).

We find that the Tax Court did not clearly err in finding that the Estate was negligent in underpaying estate tax. Arguing to the contrary, the Estate emphasizes the effort Milner expended to assess the Estate's proper tax liability. But the Estate does not explain how, despite Milner's efforts, he did not question the feasibility of a $6 million difference in reportable assets, especially given his education and background in finance. The Tax Court did not clearly err when it determined Milner should have recognized that such a "fabulous opportunity to avoid tax obligations" was "too good to be true." *Neonatology Assocs., P.A. v. Comm'r*, 299 F.3d 221, 234–35 (3d Cir. 2002); *Estate of Fields*, T.C.M. (RIA) 2024-090 at 25.

We also find the Tax Court did not clearly err when it held the reasonable cause and good faith exception did not apply. The Estate maintains it had reasonable cause because "Milner hired professionals to make [tax] determination[s] for him so that he did not need to interpose himself as a tax expert." But merely engaging tax and legal professionals does not, by itself, demonstrate reasonable cause. Indeed, as the Tax Court stated, the Estate did not prove that any lawyer or accountant advised Milner that including Fields's partnership interest instead of the asset values in the gross

estate was proper. *Estate of Fields*, T.C.M. (RIA) 2024-090 at 25. To the contrary, Milner testified that his attorney, Katzen, advised him on the potential tax benefits of creating AM Fields. *Ibid.* For these reasons, the Estate did not establish reasonable and good faith reliance on a tax adviser's professional judgment. The Tax Court did not clearly err in finding the Estate did not establish reasonable cause.

AFFIRMED.